GARY VICTOR DUBIN  3181
FREDERICK J. ARENSMEYER 8471
ZEINA JAFAR  9507
Dubin Law Offices
Harbor Court, Suite 3100
55 Merchant Street
Honolulu, Hawaii  96813

Telephone: (808) 537-2300
Facsimile: (808) 523-7733
Email: gdubin@dubinlaw.net
Email: farensmeyer@dubinlaw.net
Email: zjafar@dubinlaw.net

Attorneys for Plaintiffs
Peter B. Nottage Jr. and
Jennifer A. Nottage

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2012 MAY 25  PM 4: 06

N. ANAYA
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| PETER B. NOTTAGE JR, AND JENNIFER A. NOTTAGE, | CIVIL NO. 12-1-1496-05  PWB |
| | (Other Civil Action) |
| Plaintiffs, | |
| vs. | COMPLAINT; EXHIBITS 1 – 9; SUMMONS |
| THE BANK OF NEW YORK MELLON A NEW YORK CORPORATION, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21; COUNTRYWIDE HOME LOANS, INC.; BANK OF AMERICA, N.A.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; JOHN DOES 1-50; JANE DOES 1-50; DOE PARTNERSHIPS 1-50; DOE CORPORATIONS 1-50; DOE ENTITIES 1-50; and DOE GOVERNMENTAL UNITS 1-50, | |
| Defendant. | |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

# EXHIBIT 1



## COMPLAINT

COME NOW Plaintiffs, PETER B. NOTTAGE JR. and JENNIFER A. NOTTAGE, by and through their undersigned attorneys, and for their Complaint against Defendants herein, allege and aver as follows:

### JURISDICTION AND VENUE

1. This Complaint is filed in part (a) pursuant to various Hawaii consumer unfair and deceptive business acts and practices prohibitions codified in Chapter 480 of the Hawaii Revised Statutes, (b) pursuant to the written contractual agreements specified herein below, (c) pursuant to Section 632-1 of the Hawaii Revised Statutes, (d) pursuant to common law doctrines proscribing fraudulent conduct, (e) pursuant to Rule 57 of the Hawaii Rules of Civil Procedure, (f) pursuant to the provisions of Chapter 667 of the Hawaii Revised Statutes, and (g) pursuant to common law and statutory trust law.

2. Venue is proper in this Circuit where a purported "Notice of Mortgagee's Intention To Foreclose Under Power of Sale," "Assignment of Mortgage," "Mortgagee's Affidavit of Foreclosure Sale Under Power of Sale," and "Limited Warranty Deed" discussed below were wrongfully recorded in the office of the State of Hawaii Bureau of Conveyances thereby attempting to wrongfully transfer title to Plaintiffs' home as described below.

### THE PARTIES

3. Plaintiffs, PETER B. NOTTAGE JR. and JENNIFER A. NOTTAGE ("Plaintiffs") are residents of the State of Hawaii, and the owners of the real property located at 76-863 North Pakalakala Place, Kailua-Kona, HI 96740.

2

4.  Defendant THE BANK OF NEW YORK MELLON A NEW YORK CORPORATION, is being sued herein in its capacity as TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, a mortgage securitization trust registered with the United States Securities and Exchange Commission.

5. Defendant BANK OF AMERICA, N.A., successor by merger to BAC HOME LOANS SERVICING COUNTRYWIDE HOME LOANS SERVICING, LP ("Bank of America") is a national banking association and a Delaware corporation doing business in the State of Hawaii at all times relevant hereto.

6.  Defendant COUNTRYWIDE HOME LOANS, INC. ("Countrywide") was or is a mortgage lending association now believed to be associated with Defendant BANK OF AMERICA. Countrywide Home Loans, Inc. is a wholly owned subsidiary of Countrywide Financial Corporation, which is a wholly owned subsidiary of the publicly traded Bank of America Corporation.

7.  Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") purports to be a Delaware corporation, headquartered in Reston in the State of Virginia, doing business throughout the State of Hawaii.

8. Plaintiffs believe, and based upon such belief, further allege and aver that there are other individuals, groups, and/or entities, including agents, servants, employers, employees, partners, associates, lenders, loan officers, appraisers, notaries, co-venturers, joint venturers, shareholders, attorneys, accountants, and/or assistants of said already named Defendants, sued herein as Does, who are also partially

3

responsible for the injuries, damages, and harm herein below complained of, whose true identities and capacities are not yet known to Plaintiffs and to their attorneys, or whose involvement in same has not yet been identified; and leave of Court will be requested to add same as additional named Defendants herein at such time as their true identities and capacities and participation in same may become known.

## THE FACTS

9. This action arises out of the implosion of the real estate market, which has created a frenzy among banks to foreclose on as many properties as possible by acting outside of the law in their foreclosure practices.

10. Plaintiffs are the owners of the real property located at 76-863 North Pakalakala Place, Kailua-Kona, HI 96740 (hereinafter "subject property") pursuant to the Limited Warranty Deed recorded in the State of Hawaii Bureau of Conveyances on October 26, 2004 as Document No. 2004-217525, as set forth in Exhibit 1.

11. On September 15, 2005, Plaintiffs obtained an Adjustable Rate Note from Countrywide. In consideration for said loan, Plaintiffs were required to grant Countrywide a Mortgage on the property, a copy of which Mortgage is set forth in Exhibit 2 and recorded in the State of Hawaii Bureau of Conveyances on September 20, 2005 as Document No. 2005-188824, and as subsequently amended by the Modification Agreement to Note/Mortgage attached hereto as Exhibit 3, and recorded in the State of Hawaii Bureau of Conveyances on August 29, 2006 as Document No. 2006-158655. Said mortgage provided that "'MERS' is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns."

4

12. In 2008, Plaintiffs began experiencing severe economic hardships due to the state of the economy, the slowdown in the industry of their business, and due to Plaintiff Jennifer Nottage's extreme emotional distress, anxiety, and increasing need for medical attention and care.

13. At some point not now known to Plaintiffs, Bank of America began acting as the servicer of their loan.

14. As a result of their worsening economic conditions, Plaintiffs became unable to make payments on their subject mortgage loan and as a result, attempted to modify their loan through the "Hope Department" of Bank of America in January of 2010. Plaintiffs complied with Bank of America's requests for documentation supporting such economic hardships.

15. Plaintiffs relied on Bank of America's promise to help and sent all documents requested such as earnings statements, bank statements etc.

16. In February 2010, Bank of America first sent Plaintiffs a letter stating it could not fulfill any such modification request, and a few weeks later mailed Plaintiffs another letter stating it was reviewing their hardship modification request.

17. Plaintiffs relied upon representations made by Bank of America representatives that they were trying to help Plaintiffs keep their home and that no payments needed to be made in the meantime while Bank of America was processing their modification request.

18. Notwithstanding Plaintiffs repeated and vigorous attempts to modify their subject mortgage loan and assurances by Bank of America representatives of their willingness to help, Plaintiffs received a Notice Under Fair Debt Collections letter on

5

March 4, 2010, from a stranger to their subject mortgage loan, an entity they had never heard of, the Bank of New York Mellon a New York Corporation, as Trustee for the Certificateholders CWMBS, Inc., CHL Mortgage Pass-Through Trust 2006-21, Mortgage Pass-Through Certificates, Series 2006-21 ("The Defendant Trustee").

19. On April 5, 2010, Plaintiffs received a letter from Bank of America indicating rejection of their request for modification.

20. Despite Plaintiff's loan modification application, and despite Bank of America's promise to help and assurances that Plaintiff need not pay while they processed the request, on April 22, 2010, Plaintiffs received the Notice of Mortgagee's Intent to Foreclose Under Power of Sale recorded in the State of Hawaii Bureau of Conveyances on April 22, 2010 as Document No. 2010-055037, as set forth in Exhibit 4.

21. On April 13, 2011, a complete stranger to Plaintiffs' subject mortgage loan, the Defendant Trustee for the Certificateholders CWMBS, Inc., CHL Mortgage Pass-Through Trust 2006-21, Mortgage Pass-Through Certificates, Series 2006-21 claims to have conducted a nonjudicial foreclosure on Plaintiffs' home, as set forth in the "Mortgagee's Affidavit of Foreclosure Under Power of Sale," recorded in the State of Hawaii Bureau of Conveyances on April 26, 2011 as Document No. 2011-068022, attached hereto as Exhibit 5, and subsequently executed a Limited Warranty Deed on April 13, 2011 as a result thereof, which was suspiciously recorded in the State of Hawaii Bureau of Conveyances on July 6, 2011 as Document No. 2011-105383, almost two months after execution of said document, a copy of which is set forth in Exhibit 6.

6

22. However, as explained below, the Defendant Trustee lacked legal or contractual authority to foreclose because it never properly received the subject mortgage loan and has never been a holder thereof; and furthermore because its alleged claim to title was the result of fraud, breach of note and mortgage, and noncompliance with the strict requirements of Section 667-5 of the Hawaii Revised Statutes.

23. First, the Defendant Trustee claimed its authority to foreclose pursuant to an "Assignment of Mortgage," recorded in the State of Hawaii Bureau of Conveyances on April 22, 2010 as Document No. 2010-055036, attached hereto as Exhibit 7, purporting to assign Plaintiffs' Mortgage from MERS as a nominee for Countrywide to the Defendant Trustee.

24. However, said Assignment was procured by fraud, and this is a complete legal nullity.

25. At the time that Assignment was signed and recorded, Plaintiffs' lender Countrywide no longer existed. Thus, it was impossible for Countrywide, MERS as its nominee, or anyone to have assigned Plaintiffs' mortgage to anyone in April 2010.

26. Moreover, MERS, as a nominee of the original lender Countrywide, had absolutely no authority to assign the subject Note, to which it was never a party or a holder, to anyone, as there is no evidence to suggest the Note was endorsed or negotiated in favor of MERS. The subject promissory Note, which is a negotiable instrument, must have been either endorsed to MERS on the note itself, or endorsed in blank or to bearer and physically held by MERS. See HRS §§ 490:3-301, 490:3-309. In the absence of a properly endorsed or held note, MERS lacked any authority to assign

7

said Note and was only authorized to act as Countrywide's nominee under the Mortgage.

27. Because MERS never owned the Note, had no beneficial interest in the Note, was not a party to the Note, and was not authorized by the original lender to transfer the Note, MERS had no authority to effect this alleged transfer to the Defendant Trustee. Accordingly, the Defendant Trustee lacked any legal or contractual authority to invoke the power of sale and to conduct the nonjudicial foreclosure.

28. Thus, the Defendant Trustee's reliance upon the "Assignment of Mortgage" alone is insufficient to establish standing as a matter of law, as no interest in the debt could have been assigned without proper negotiation and transfer of the note. That is because a mortgage is but an incident to the debt which it is intended to secure and cannot exist independently. Restatement (Third) of Property (Mortgages) § 5.4 cmt. (e) (1997) ("a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation.").  To the extent this Assignment of Mortgage also purported to transfer the note by including vague language therein referencing the note, a promissory note, unlike the mortgage, is a negotiable instrument governed by the Uniform Commercial Code, and cannot be transferred by an "assignment." Instead, the subject note in this case had to have been negotiated in compliance with the requirements of Article III of the Uniform Commercial Code, which has been adopted in Hawaii as Chapter 490:3 of the Hawaii Revised Statutes.

29. Here, the Defendant Trustee has provided no evidence demonstrating that it had proper possession of the subject promissory note beyond its self-serving affidavit that it was entitled to enforce the Note. The purported Assignment of Mortgage is wholly

insufficient to establish this elemental fact. And without a complete chain of title supported by valid and enforceable transfers of the subject Note and Mortgage and contractual rights thereunder, it was improper for the Defendant Trustee to conduct a nonjudicial foreclosure and transfer title of Plaintiffs' home.

30. Additionally, said Assignment purports to transfer Plaintiffs' mortgage from Countrywide, even though Countrywide had been acquired by Bank of America, to the Trust, the "Certificateholders CWMBS, Inc., CHL Mortgage Pass-Through Trust 2006-21, Mortgage Pass-Through Certificates, Series 2006-21."

31. Said Trust, however, by its own terms closed on December 28, 2006, over four years before Plaintiffs' mortgage was allegedly assigned to it. Thus, the Defendant Trustee had absolutely no authority to accept any new assets, including Plaintiffs' mortgage loan, after the Closing Date of said Trust. Attached hereto as Exhibit 8, is a true and correct copy of the "Certificateholders CWMBS, Inc., CHL Mortgage Pass-Through Trust 2006-21, Mortgage Pass-Through Certificates, Series 2006-21 Under the Pooling and Servicing Agreement Dated December 1, 2006," a mortgage pooling and servicing agreement recorded with the United States Securities and Exchange Commission.

32. The Assignment here, however, was executed and recorded in April 2010, over four years after the December 1, 2006 Cut-Off Date and after the December 28, 2006 Closing Date.   However, pursuant to the plain language of the Trust, the Defendant Trustee had no authority to accept any new assets on behalf of the Trust after December 28, 2006.

33. In fact, Article II, Section 2.01 of the Trust specifically provides in part:

9

**Section 2.01. Conveyance of Mortgage Loans.** (a) Each Seller, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the Mortgage Loans after the Cut-off Date and all interest and principal payments on the related Mortgage Loans received prior to the Cut-off Date in respect of installments of interest and principal due thereafter, but not including payments of principal and interest due and payable on such Mortgage Loans, on or before the Cut-off Date.  On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case of the Delay Delivery Mortgage Loans (which may include Countrywide Mortgage Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans and Park Sienna Mortgage Loans), such delivery may take place within thirty (30) days following the Closing Date). Such delivery of the Mortgage Files shall be made against payment by the Depositor of the purchase price, previously agreed to by the Sellers and Depositor, for the Mortgage Loans. With respect to any Mortgage Loan that does not have a first payment date on or before the Due Date in the month of the first Distribution Date, Countrywide shall deposit into the Distribution Account on or before the Distribution Account Deposit Date relating to the first applicable Distribution Date, an amount equal to one month's interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal Balance of such Mortgage Loan.

34. Similarly, Section 2.02 of the Trust provides in relevant part:

**Section 2.02 Acceptance by Trustee of the Mortgage Loans.** (a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will

10

hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) an Initial Certification in the form annexed hereto as Exhibit F-1. Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to such Mortgage Loan. The Trustee shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

On or about the thirtieth (30th) day after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Delay Delivery Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit G-1, with any applicable exceptions noted thereon.

Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon.

35. Because the Defendant Trustee's powers and authority are limited as a matter of law by the express terms of the Trust, clearly the Trust had no authority to accept Plaintiffs' mortgage in 2010, or to foreclose thereupon.

11

36. Additionally, the Assignment of Plaintiffs' mortgage was robosigned by an individual claiming to be named Rhoena Rice, who falsely claimed under oath to be the "Vice President" of MERS, as a nominee for Countrywide (which did not then exist).

37. However, upon information and belief, Rhoena Rice was not the Vice President of MERS, or any other entity.

38. Rhoena Rice has previously robo-signed documents claiming authority from many different corporations. For example, attached as Exhibit 9 is a "Certificate of Assistant Secretary of Bank of America, National Association, Manager of BAC GP, LLC," dated March 2, 2010 in an unrelated matter just one month prior to the instant Assignment, indicating that Rhoena Rice and others are Assistant Vice Presidents of BAC GP, LLC.

39. This is but the latest example of the highly publicized foreclosure document fraud scheme which has swept the nation, causing major national financial institutions like GMAC Bank, JP Morgan Chase, and Bank of America to freeze foreclosures nationwide, resulting in a Congressional investigation. Rhoena Rice is but the latest "robo-signer" to be caught, this time having committed a fraud resulting in the wrongful foreclosure of Plaintiffs' home.

40. Due to the fraud in the assignment of Plaintiffs' mortgage, as well as the failed securitization of that mortgage, the Assignment relied upon by the Defendant Trustee and its agents to conduct its power of sale foreclosure is a legal nullity, rendering the subsequent alleged nonjudicial foreclosure sale void, as the Defendant Trustee cannot demonstrate a complete chain of title as necessary to prove its contractual authority to conduct a nonjudicial foreclosure.

12



41. In addition to the above described defects, even if the Defendant Trustee somehow had contractual authority despite such rampant fraud, it failed to conduct its alleged nonjudicial foreclosure in compliance with the requirements of Section 667-5 of the Hawaii Revised Statutes, rendering its alleged nonjudicial foreclosure statutorily defective and void.

## COUNT ONE
## Wrongful Foreclosure

42. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

43. Pursuant to Section 667-5 of the Hawaii Revised Statutes, a power of sale nonjudicial foreclosure is a private contractual remedy available only to a mortgagee or a successor assignee and holder in of the mortgage loan. The nonjudicial foreclosure here, however was not conducted by a proper mortgagee, successor assignee, or holder, and was not conducted in compliance with the strict requirements of Section 667-5.

44. Additionally, the Defendant Trustee here was not authorized to accept any new mortgage assets after the trust closed. That is because the law applicable to trustees prohibits this Plaintiff Trustee from doing anything that it is not authorized to do under the express language of the Trust. 90A C.J.S. Trusts § 323 (2011):

> The doctrine of ultra vires applies when the trustee is without authority to perform an act in any circumstances or for any purpose. If a trustee exceeds his or her powers, his or her acts are a nullity and, in the absence of other considerations, are ordinarily without force and effect. Furthermore, acts done by a trustee in contravention of the trust, and not authorized by a statute are void.



See also, Lurie v. Blackwell, 285 Mont. 404, 408, 948 P.2d 1161, 1163 (1997) ("the doctrine of ultra vires applies when a trustee is without authority to perform an act in any circumstances or for any purpose.").

45. Based upon the facts set forth above, including the failure of Countrywide to assign the subject mortgage loan and transfer that loan to the Trust in 2006 before the Trust closed, as well as the fraudulent Assignment of Plaintiffs' mortgage – where Countrywide had been acquired by Bank of America – by MERS on behalf of Countrywide by robo-signer Rhoena Rice, which also amount to unfair and deceptive acts and practices against a consumer in violation of Chapter 480 of the Hawaii Revised Statutes, Plaintiffs are entitled, pursuant to Section 480-13 of the Hawaii Revised Statutes, to their actual and treble damages sustained as a result of said wrongful foreclosure and transfer of title to his home, in an amount to be proven at trial, including, but not limited to, the fair market value of the subject property, damage to their credit rating, and other pecuniary losses, as well as attorney's fees and costs.

46. Plaintiff also seeks a judgment that the nonjudicial foreclosure sale conducted on the subject property is void and unenforceable, entitling Plaintiff to have said title transfer set aside.

## COUNT TWO
### Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

47. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

48. As an alternative theory of relief, the Defendant Trustee, assuming arguendo it actually had legal or contractual authority to invoke the power of sale, had a duty of

14

good faith and fair dealing with Plaintiffs, the mortgagors, as to all matters related to performance of the subject mortgage loan, by claiming to be the assignee and successor in interest to Countrywide, the original lender.

49. The Defendant Trustee declared Plaintiffs to be in breach of the mortgage loan and proceeded with the wrongful nonjudicial foreclosure of the subject property despite the fact that the Defendant Trustee was not the lawful holder of the Note and Mortgage and had no right to conduct the nonjudicial foreclosure.

50. Hawaii courts have also adopted the Restatement of Contracts and have noted that parties have "a duty of good faith and fair dealing in performing its contractual obligation." Hawaii Leasing v. Klein, 5 Haw. App. 450, 456, 698 P.2d 309, 313 (1985) (citations omitted). And Hawaii Revised Statutes Section 490:1-304 provides that "a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, are medial right or power." Accordingly, a cause of action for breach of contract can arise from not performing or enforcing an obligation in good faith.

51. The Defendant Trustee, failed to take commercially reasonable steps to verify its lawful ownership of the Note and the Mortgage before declaring Plaintiffs in default of the Note and Mortgage and pursuant to Hawaii Revised Statutes Section 501-212, Plaintiffs are entitled to damages as a result of the Defendant Trustee's breach of contract resulting in the unlawful foreclosure of Plaintiffs' home, in an amount to be proven at trial, including, but not limited to, the fair market value of the subject property, damage to their credit rating, and other pecuniary losses, as well as attorney's fees and costs.

 

52. Plaintiff also seeks a judgment that the nonjudicial foreclosure sale conducted on the subject property is void and unenforceable, entitling Plaintiff to have said title transfer set aside.

### COUNT THREE
### UDAP

53. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

54. As more fully described above, Defendants' acts and practices were likely to deceive, constituting a fraudulent business act or practice.

55. The Supreme Court of Hawaii has explicitly defined a deceptive act or practice is as a "(1) a representation, omission, or practice[ ] that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) [ ] the representation, omission, or practice is material." Courbat v. Dahana Ranch, Inc., 111 Hawaii 254, 264, 141 P.3d 427, 435 (2006) (citations omitted). A representation, omission, or practice is considered "material" if it involves "information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Id.

56. Specifically, as fully set forth above, Defendants engaged in deceptive business practices with respect to mortgage loan servicing, Assignment of Mortgage, execution of the Limited Warranty Deed, wrongful foreclosure of Plaintiffs' home, and related matters by, among other things:

(a)  Instituting a wrongful nonjudicial foreclosure upon Plaintiffs' home without contractual authority to do so;

(b)  Executing and recording false and misleading documents;

(c) Executing and recording documents without the legal authority to do so;

(d) Failing to disclose the principal for which documents were being executed and recorded;

(e) Failing to record Powers of Attorney in connection with other recorded documents;

(f) Accepting the subject mortgage as trustee without the legal authority to do so;

(g) Other deceptive business practices.

57. The foregoing acts and practices have caused substantial harm to Plaintiffs.

58. Defendants have been unjustly enriched from their wrongful and unlawful nonjudicial foreclosure upon Plaintiffs' home when they had not done so in compliance with applicable laws.

59. Defendants' conduct was willful and/or knowing, entitling Plaintiffs to an award of actual, threefold, and punitive damages in an amount to be determined at trial, as well as their attorneys' fees and costs, pursuant to Section 480-13 of the Hawaii Revised Statutes.

60. Plaintiff also seeks a judgment that the nonjudicial foreclosure sale conducted on the subject property is void and unenforceable as procured by unfair and/or deceptive acts and practices, entitling Plaintiff to have said title transfer set aside.

## COUNT FOUR
### Fraud

61. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

62. Based upon the facts set forth above, the critical title documents, the Assignment of the Mortgage, and the Limited Warranty Deed are products of fraud committed by robo-signers misrepresenting their authority and corporate capacity, and are therefore legally void. Accordingly, the Defendant Trustee, the assignee of the fraudulent transfer of Plaintiffs' subject Mortgage, lacked any legal or contractual authority to invoke the power of sale in the first place and to conduct the nonjudicial foreclosure.

63. The Defendant Trustee's false, fraudulent, and material representations that it was the lawful holder of the Note and Mortgage and had legal and contractual authority to conduct the nonjudicial foreclosure, caused the wrongful nonjudicial foreclosure of the subject property.

64. The Defendant Trustee declared Plaintiffs to be in breach of the mortgage loan and proceeded with the nonjudicial foreclosure, knowing that it was not the proper mortgagee, successor assignee, or holder of the mortgage loan, but inducing Plaintiff to believe otherwise.

65. Based on the Defendant Trustee's false and material representations, Plaintiff reasonably believed the Defendant Trustee was the proper mortgagee, successor assignee, or holder of the mortgage loan with legal and contractual authority to conduct the nonjudicial foreclosure.

66. As a result of the Defendant Trustee's fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, compensatory, general and special damages in an amount to be proven at trial, including, but not limited to, the fair market value of the



subject property, damage to their credit rating, and other pecuniary losses, as well as attorney's fees and costs.

67. Plaintiff also seeks a judgment that the nonjudicial foreclosure sale conducted on the subject property is void and unenforceable as procured by fraud, entitling Plaintiff to have said title transfer set aside.

## COUNT FIVE
### Negligent Misrepresentation

68. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

69. The Defendant Trustee, its agents, and attorneys, acting as the alleged foreclosing mortgagee, but without the legal authority to do so, had a duty to exercise reasonable care and skill to follow Hawaii law with regard to foreclosures, to refrain from taking any action against Plaintiffs that it did not have legal authority to do, and to provide Plaintiffs with accurate information regarding the transfer and assignment of their Mortgage.

70. The Defendant Trustee's, its agents' and attorneys' representations that it had authority to foreclose were false, negligent and material.

71. In taking the actions discussed and alleged above, the Defendant Trustee, its agents, and attorneys breached their duty of care and skill owed to Plaintiffs in servicing their loan, by and among other things, failing to disclose that it lacked authority to foreclose, preparing and recording false documents, and foreclosing on the subject property without having the legal authority and/or proper documentation to do so.

19



72. As a direct and/or proximate result of the Defendant Trustee's, its agents' and attorneys', negligent acts and omissions in proceeding with the unlawful foreclosure of the subject property all the while knowing the Assignment of Mortgage was (a) executed by known robo-signers without any legal authority or capacity to execute the same; and (b) that Countrywide, the alleged assignor, did not even exist at the time the Assignment of Mortgage was executed, Plaintiffs have suffered, and will continue to suffer, general and special damages in an amount to be proven at trial, including, but not limited to, the fair market value of the subject property, damage to their credit rating, and other pecuniary losses, as well as attorney's fees and costs.

## COUNT SIX
### Intentional and Negligent Infliction of Emotional Distress

73. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

74. The Defendant Trustee, its agents, and attorneys, knew or should have known, with the exercise of commercially reasonable care, that prior to commencing the subject nonjudicial foreclosure, that it did not in fact own the subject Note and Mortgage originated by Countrywide and that it did not have the requisite legal authority to conduct the foreclosure.

75. The Defendant Trustee, its agents and attorneys, knew or should have known, that the unlawful nonjudicial foreclosure of Plaintiffs' Property, being their principal residence, was likely to cause them to suffer severe emotional distress, mental anguish, insomnia, headaches, anxiety and depression (collectively "Emotional Distress").

20

76. As a proximate result of the Defendant Trustee's, its agents' and attorneys', negligent acts and omissions, as well as their intentional and deliberate acts in proceeding with the unlawful foreclosure of the subject property all the while knowing the Assignment of Mortgage was (a) executed by known robo-signer without any legal authority or capacity to execute the same; and b) that Countrywide, the alleged assignor, did not even exist at the time the Assignment of Mortgage was executed, the Defendant Trustee did cause Plaintiffs to suffer Emotional Distress.

77. Specifically, Plaintiff Jennifer Nottage's suffered extreme Emotional Distress, which temporarily rendered her unable to drive and to conduct other activities of daily living, as well as resulted in an increasing need for medical attention and care.

### COUNT SEVEN
### Promissory Estoppel

78. Plaintiffs repeat, reallege, and incorporate herein by reference the allegations contained in the above Paragraphs 1 through 41, inclusive, as though fully set forth herein.

As explained above, in applying for the loan modification, Plaintiffs relied upon representations, false promises, and assertions made by Bank of America that it was willing to accommodate a loan modification to help Plaintiffs keep their home and that no payments needed to be made in the meantime while Bank of America was processing their modification request. Plaintiffs sent all documents requested such as earnings statements, bank statements etc.

79. Despite Plaintiffs' loan modification application, and despite Bank of America's promise to help and assurances that Plaintiffs need not pay while they processed the request, on April 22, 2010, Plaintiffs received the Notice of Mortgagee's

21

Intent to Foreclose Under Power of Sale recorded in the State of Hawaii Bureau of Conveyances on April 22, 2010 as Document No. 2010-055037, as set forth in Exhibit 4, and thereafter proceeded with a foreclosure. However, Bank of America was legally estopped from foreclosing under the doctrine of promissory estoppel.

"[A] promissory estoppel may arise as an application of the general principle of equitable estoppel to certain situations where a promise has been made, even though without consideration, if it was intended that the promise be relied upon and was in fact relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustices." Montonaga v. Ishimaru, 38 Haw. 158, 163 (1948) (citations omitted).

Section 90 of the Restatement (Second) of Contracts (1979), which we expressly adopted in Ravelo by Ravelo v. Hawaii County, 66 Haw. 194, 200, 658 P.2d 883, 887 (1983), articulates the doctrine of promissory estoppel:

> § 90. Promise Reasonably Inducing Action or Forbearance
> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires...

Ravelo, 66 Haw. At 200, 658 P.2d at 887 (quoting Restatement (Second) of Contracts § 90).

80. The representations here were made by employees of Bank of America and its predecessor entity BAC Home Loans servicing Countrywide. These misrepresentations were made during the period just prior to and during Plaintiffs' application for a loan modification. The content of these misrepresentations concerned the necessity to be in default before any modification could be discussed.

22

81. Plaintiffs justifiably relied on the Defendant Trustee's representations to their detriment, as their house was unnecessarily foreclosed upon and wrongfully sold.

82. As a proximate result of Chase's negligent conduct, Plaintiffs have suffered, and will continue to suffer, great emotional distress, general and special damages in an amount according to proof at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against all Defendants, individually and/or jointly and severally, as the Court may determine to be just, as pled, reserving his right to seek to have this action converted into a class action should the evidence subsequently adduced in discovery show that the harm done to Plaintiffs represents a general pattern of unlawful, fraudulent, and predatory practices similarly waged against other borrowers in this State and elsewhere, as follows:

A. For actual, and treble damages arising from the unfair and deceptive acts and practices pursuant to Section 408-13 of the Hawaii Revised Statutes;

B. For judgment and damages declaring the subject Assignment of the Mortgage to the Defendant Trustee void and unenforceable, and the Defendant Trustee's subsequent purported nonjudicial foreclosure null and void;

C. For an order striking any and all other subsequent wrongfully recorded foreclosure related documents and null and void documents attempting to transfer title of Plaintiff's home, from the records of the Bureau of Conveyances.

D. For Costs of Suit -- in an amount to be decided by the Court;

E. For Attorneys' Fees -- in an amount to be determined by statute and/or decided by the Court; and

23

F.  For punitive damages;

G.  For such other and further relief as deemed just and proper by this Court.

DATED: Honolulu, Hawaii; May 25, 2012.

GARY VICTOR DUBIN
FREDERICK J. ARENSMEYER
ZEINA JAFAR
Attorneys for Plaintiffs
Peter B. Nottage Jr. and
Jennifer A. Nottage





R-355   STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
OCT 26, 2004        08:01 AM

Doc No(s) 2004-217525

/s/ CARL T. WATANABE
REGISTRAR OF CONVEYANCES

26    1/2    Z2        CONVEYANCE TAX: $490.00

| LAND COURT SYSTEM | REGULAR SYSTEM |
|---|---|

Return by:  MAIL ( )    PICKUP ( X )   TO:                                                          RS ①

MR. ANDREW MEISLIN                    TITLE NO.:        200446330 P
BANK OF HAWAII                        ESCROW NO.:  A3-361-1834-0028-0
75-5722 KUAKINI HWY.                         JANET LUM WON
STE. 213
KAILUA-KONA, HI 96740           TOTAL NUMBER OF PAGES: __26__

TITLE OF DOCUMENT:

**LIMITED WARRANTY DEED
WITH COVENANTS AND RESERVATIONS**

PARTIES TO DOCUMENT:

**SELLER:**   **MARYL GROUP, INC.,** formerly known as MARYL DEVELOPMENT, INC., a
Hawaii corporation, with its mailing address at 75-1000 Henry Street, Suite 200,
Kailua-Kona, Hawaii 96740

**BUYER:**    **PETER B. NOTTAGE, JR. and JENNIFER A. NOTTAGE,** husband and wife,
whose mailing address is 75-5781 Kalala Place, Kailua-Kona, Hawaii 96740

TAX MAP KEY (3) 7-6-012:149                              K2004590/SVQ/jsp/10.7.04
'IOLANI, INCREMENT IV, LOT 28

## LIMITED WARRANTY DEED
## WITH COVENANTS AND RESERVATIONS

### PARTIES:

**SELLER:**   **MARYL GROUP, INC.**, formerly known as MARYL DEVELOPMENT, INC., a Hawaii corporation, with its mailing address at 75-1000 Henry Street, Suite 200, Kailua-Kona, Hawaii 96740.

**BUYER:**   **PETER B. NOTTAGE, JR.** and **JENNIFER A. NOTTAGE**, husband and wife, whose mailing address is 75-5781 Kalala Place, Kailua-Kona, Hawaii 96740.

### DESCRIPTION OF PROPERTY:

The property covered by this Limited Warranty Deed is described in Exhibit "A" attached to this document.

### SALE AND TRANSFER OF PROPERTY:

In return for the Buyer's payment of the purchase price as agreed between Seller and Buyer, the Seller sells and transfers the property described in Exhibit "A" to the Buyer.

### SALE AND TRANSFER OF OTHER RIGHTS:

Seller also sells and transfers to the Buyer the following:

(A)    All improvements located on the property;

(B)    All rights the Seller has in other property because of the Seller's ownership of the property being sold (these rights are known as "easements and appurtenances");

(C)    All rents or royalties from the property;

2.

2

(D)     Any mineral and metallic rights owned by the Seller in the property;
and

(E)     All other rights or privileges that the Seller owns because of the
Seller's ownership of the property.

## BUYER'S TENANCY:

The Buyer will take and own the property as **Tenants by the Entirety**. The
Buyer will also own the other rights described above in the same tenancy.

## SELLER'S WARRANTIES:

By signing this Limited Warranty Deed, the Seller gives the Buyer a limited
warranty of title.  This means that Seller only guarantees:

(A)     That the Seller has the right to transfer and convey the property and
other rights described in Exhibit "A" and this Limited Warranty Deed;

(B)     That during the Seller's ownership of the property and the other rights
being transferred and conveyed by this Limited Warranty Deed, no liens, claims or
encumbrances created by the Seller attached to or arose against the property or the
other rights unless those liens, claims or encumbrances are described in this Limited
Warranty Deed or in Exhibit "A" under the title "SUBJECT TO"; and

(C)     That the Seller will defend the Buyer's ownership against any liens,
claims or encumbrances created by the Seller that arose during the Seller's ownership
of the property and the other rights being transferred and conveyed by this Limited
Warranty Deed unless those liens, claims or encumbrances are described in this
Limited Warranty Deed or in Exhibit "A".

## SELLER'S RESERVATION OF CERTAIN RIGHTS:

In addition to the rights and privileges reserved by the Seller as described in
Exhibit "A", the Seller and Buyer specifically acknowledge and agree:

1.     That notwithstanding the sale and transfer of the property as described
in this Limited Warranty Deed, the Seller, and the Seller's agents, employees,
contractors, licensees, successors and assigns, shall have and retain the right to
re-enter upon and temporarily occupy the property for the purpose of surveying,
constructing, reconstructing, installing, repairing and maintaining subdivision
easements and/or improvements for, and performing other similar or related work
within, 'IOLANI, including, without limiting the generality of the foregoing, the

3.

construction and installation of roadways, culverts, dry wells, sidewalks, address monuments, delivery receptacles (for mail, newspapers, etc.), underground pipelines, utility fixtures, fire hydrants, meters, transformer vaults, switching vaults, pull boxes, handholes, underground and/or overhead power lines, drainage culverts, swales and ditches and other related appurtenant facilities and equipment and drainage structures, provided, however, that upon the completion of the construction and installation of the easements and/or improvements described in this paragraph 1, the Seller shall make such reasonable efforts as may be necessary to restore the contour and grade of the property to as near as practicable to that which existed prior to the commencement of the construction and installation of the easements and/or improvements described in this paragraph 1, or as otherwise depicted on the County approved Subdivision engineering plans.

.  2.    That the County of Hawaii may later determine that additional easements and/or improvements are required of the Seller across, on, over or under portions of the property being purchased by the Buyer and the Seller therefore reserves the right to create, establish, construct, maintain and dedicate or convey to the County of Hawaii any such additional easements and/or improvements on the property being purchased by the Buyer after the transfer of the property to the Buyer, all as provided in paragraph 1 above. If such additional easements and improvements are required of the Seller by the County of Hawaii, the Buyer covenants and agrees to join with the Seller in the granting, delivery and/or dedication of any such easements and/or improvements to the County of Hawaii and to execute any instruments or documents necessary or appropriate thereto. Buyer further agrees that by signing and accepting this Limited Warranty Deed, the Buyer waives and releases any and all rights or claims the Buyer might otherwise have against the Seller, whether in law or equity, on account of such additional easements and/or improvements, including, but not limited to, any rights the Buyer might otherwise have as to a rescission of this Limited Warranty Deed or a recovery of all or a portion of the purchase price for the property.

3.    That the Seller, until the dedication thereof to the State or County of Hawaii, shall have the right to grant easements for access and other purposes over, under and across the Road Lots described in the Subdivision Maps to other persons upon such terms and conditions as the Seller shall deem necessary and/or appropriate.

4.    That the Seller reserves the right unto itself, and its successors and assigns, to delete, relocate, realign and grant to other persons all easements and rights-of-ways over, under and on the property being purchased by the Buyer which the Seller shall determine to be necessary or desirable, including, but not limited to, easements and/or rights-of-ways for utilities such as water, telephone, gas and electricity, lighting, cable television, and landscaping and walkways; provided that such easements and/or rights-of-way shall not be located on or within any areas in

4.

which any buildings are or may be constructed on the property and shall not be exercised so as to unreasonably disturb, impair or interfere with the normal use and enjoyment of the property being purchased by the Buyer. The Buyer hereby consents to any such deletion, relocation, realignment and grant of easements and/or rights-of-ways as provided above and agrees to execute and deliver such documents and instruments and do such other things as may be necessary or convenient to effect the same.

5.      That until the Seller shall have completed the construction and installation of the subdivision easements and/or improvements described in paragraphs 1, 2 and 3 above, and the subdivision easements and/or improvements have been accepted for dedication by the County of Hawaii, the Seller's rights and privileges as reserved in this Limited Warranty Deed shall constitute a burden on and a covenant running with the property and any person who succeeds to the Buyer's rights and interest in the property prior to that time shall be bound by and observe the Seller's rights and privileges reserved in this Limited Warranty Deed.

## BUYER'S PROMISES:

By signing and accepting this Limited Warranty Deed, the Buyer acknowledges and agrees as follows:

1.      That the Buyer has read and understands all of the terms and conditions of this Limited Warranty Deed, the Exhibits attached to this Limited Warranty Deed and the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI described in Exhibit "A".

2.      That the property the Buyer is purchasing which is described in Exhibit "A" is a portion of the 'IOLANI subdivision, and that Buyer's use and possession of the property is subject to and governed by the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI described in Exhibit "A".

3.      That by signing and accepting this Limited Warranty Deed, the Buyer is (i) agreeing to abide and be bound by the terms and provisions of the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI described in Exhibit "A", (ii) agreeing to join in, execute and deliver any dedication or grants as described in this Limited Warranty Deed, and (iii) agreeing with the Seller and with all other "Owners" of property within 'IOLANI to perform, comply with, and discharge each and all of the responsibilities, duties and obligations imposed upon the Buyer by the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI.

4.      That the Buyer agrees that for a period of two (2) years following the transfer of the property to the Buyer, or until the Seller has notified the Buyer that it has completed its sales activities for 'IOLANI, whichever shall occur first, the Buyer shall not conduct any "open house" events related in any way to the resale of Buyer's property, nor erect any signs on the property or in any portion of 'IOLANI, including any public or private roadways, indicating that the property is for sale or for rent.

5.      That with respect to the initial construction of any buildings on the property the Buyer is acquiring under this Limited Warranty Deed, the Buyer, and/or the Buyer's successors and assigns, acknowledge, covenant and agree that the roofing material on such buildings shall be composed of Monier tile in "Pali Green" color, or such other color(s) or composition as Seller shall approve prior to the Buyer's commencement of construction. The Buyer's promise and agreement as contained in this Paragraph 5 to obtain the prior approval of the Seller as to the color and composition of the roof of any buildings to be constructed on the property is in addition to the Buyer's obligation and requirement under the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI described in Exhibit "A" to obtain the approval of the Architectural Review Committee of the Association for such Improvements. The Seller shall have the same rights and remedies for the enforcement of the Buyer's promise and agreement under this Paragraph 5 as provided in Section 8.4 of the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI described in Exhibit "A" for the enforcement of the terms and provisions of said Declaration.

6. That the Seller's reservation of certain rights, the Buyer's promises and agreements and the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI set forth and described in this Limited Warranty Deed and Exhibit "A" are covenants running with the property and any document of conveyance by which the Buyer sells or transfers any interest in the property shall be subject to and describe said reservations, promises and agreements and the Declaration of Protective Covenants, Conditions and Restrictions for 'IOLANI.

## DEFINITIONS:

The word "person" includes natural persons, business organizations and any other entity the law allows to own property or conduct business;

The words "Seller" and "Buyer" include the persons named in this Deed and those who take over or succeed to that person's rights or interests, whether by purchase, inheritance, operation of law or otherwise.

6.

**DATE**:

This Limited Warranty Deed With Covenants and Reservations is dated this _18th_ day of _October_, 2004.

MARYL GROUP, INC., formerly known as MARYL DEVELOPMENT, INC., a Hawaii corporation

By _____

Print Name: <u>KENNETH M. MELROSE</u>

Print Title: <u>Secretary</u>

SELLER

_____

PETER B. NOTTAGE, JR.

_____

JENNIFER A. NOTTAGE

BUYER

APPROVED AS TO FORM

BROOKS TOM PORTER & QUITIQUIT, LLP

S. V. (BUD) QUITIQUIT

10.7.04

7.

7

**DATE**:

This Limited Warranty Deed With Covenants and Reservations is dated this _20th_ day of _October_____, 2004.

**MARYL GROUP, INC.,** formerly known as **MARYL DEVELOPMENT, INC.,** a Hawaii corporation

By _____
Print Name: _____
Print Title: _____

SELLER

_____
PETER B. NOTTAGE, JR.

_____
JENNIFER A. NOTTAGE

BUYER

APPROVED AS TO FORM

BROOKS TOM PORTER & QUITIQUIT, LLP

S. V. (BUD) QUITIQUIT

10.7.04

7.

8

STATE OF HAWAII )
                   ) SS.
COUNTY OF HAWAII )

On this 18th day of October 2004, before me appeared KENNETH M. MELROSE, to me personally known, who, being by me duly sworn, did say that he/she is the Secretary of MARYL GROUP, INC., formerly known as MARYL DEVELOPMENT, INC., a Hawaii corporation, and that said instrument was signed in behalf of said corporation by authority of its Board of Directors, and said officer acknowledged said instrument to be the free act and deed of said corporation.

Julie A. McIntyre
Print Name: Julie A. McIntyre
Notary Public, State of Hawaii
My commission expires: 7/25/08

8.

9

STATE OF HAWAII          )

                                   ) SS.

COUNTY OF HAWAII      )

On this _____ day of _____OCT 2 0 2004_____, 2004, before me personally appeared **PETER B. NOTTAGE, JR.**, to me personally known (or proved to me on the basis of satisfactory evidence) to be the person described in and who executed the foregoing instrument, who, being by me duly sworn or affirmed, did say that such person(s) executed the foregoing instrument as the free act and deed of such person(s), and, if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

L S

_____

Print Name: _____

Notary Public, State of Hawaii

My commission expires: _____

ANDREW MEISLIN

Notary Public, State of Hawaii

My commission expires: Dec. 16, 2006

STATE OF HAWAII          )

                                   ) SS.

COUNTY OF HAWAII      )

On this _____ day of _____OCT 2 0 2004_____, 2004, before me personally appeared **JENNIFER A. NOTTAGE**, to me personally known (or proved to me on the basis of satisfactory evidence) to be the person described in and who executed the foregoing instrument, who, being by me duly sworn or affirmed, did say that such person(s) executed the foregoing instrument as the free act and deed of such person(s), and, if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

L S

_____

Print Name: _____

Notary Public, State of Hawaii

My commission expires: _____

ANDREW MEISLIN

Notary Public, State of Hawaii

My commission expires: Dec. 15, 2006

9.

## EXHIBIT "A"

All of that certain parcel of land (being portion(s) of the land(s) described in and covered by Royal Patent Grant Number 1592 to Kealalio, Royal Patent Number 4475, Land Commission Award Number 7713, Apana 43 to V. Kamamalu, and Land Patent Grant Number 3630 to W.H. Cornwell) situate, lying and being on the northwesterly side of Lako Street and on the southwesterly side of Road Lot G at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii, being LOT 28 of "IOLANI, INCREMENT IV, PHASE II", same being a portion of Lot 77 of "Iolani, Increment III, Phase II", and thus bounded and described as follows:

Beginning at the northeasterly corner of this parcel of land, being also the southeasterly corner of Lot 29 of this subdivision and being a point on the westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,517.67 feet south and 13,329.79 feet east and running by azimuths measured clockwise from true South:

Thence, for the next four (4) courses following along the westerly side of Lako Street:

Thence, from a tangent azimuth of 345° 24' 54" following on a curve to the left with a radius of 720.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 1. | 344° | 53' | 12" | 13.28 | feet to a point; |
| 2. | 344° | 21' | 30" | 50.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 270.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 3. | 10° | 25' | 45" | 237.32 | feet to a point; |
| 4. | 36° | 30' | | 15.00 | feet to a point; |

Thence, for the next five (5) courses following along the easterly side of Road Lot G of this subdivision:

Thence, following on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

EXHIBIT A
Page 1 of 16

| | | | | |
|---|---|---|---|---|
| 5. | 81° | 30' | 28.28 | feet to a point; |
| 6. | 126° | 30' | 30.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 390.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 7. | 140° | 37' | 190.24 | feet to a point; |
| 8. | 154° | 44' | 33.11 | feet to a point; |

Thence, following on a curve to the right with a radius of 10.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 9. | 199° | 44' | 14.14 | feet to a point; |
| 10. | 244° | 44' | 240.06 | feet along the easterly side of Road Lot G and along Lot 29 of this subdivision and along the remainder of Lot 77 of 'Iolani, Increment III, Phase II, Grant 1592 to Kealalio and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to the point of beginning and containing an area of 1.111 acres, more or less. |

Together with easements over, across and along Roads B, D, E, F, G, H, I, J and K within all Increments of said "IOLANI SUBDIVISION", said Road B being more particularly described in Exhibit "B" attached to instrument dated May 15, 1992, recorded as Document No. 92-100275, Roads D, E and F being more particularly described in Exhibits "A", "B" and "C", respectively, attached to instrument dated July 27, 1993, recorded as Document No. 93-129599. Said Roads G and H being more particularly described below and Roads I, J and K, all being more particularly described in that certain instrument dated January 3, 2003, recorded as Document No. 2003-002769; provided that in the event said Road B, D, E, F, G, H, I, J and K, or any one or more of said Roads are conveyed, transferred and dedicated to any governmental authority and accepted as public highways, the foresaid easements as to such dedicated Roads shall cease and terminate.

ROAD H
'IOLANI, INCREMENT IV, PHASE I

Land situated on the Northwesterly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii. Being portion of Lot 77 of 'Iolani, Increment III, Phase II; Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu; and Grant 3630 to W.H. Cornwell.

EXHIBIT A
Page 2 of 16

Beginning at the Southwesterly corner of this parcel of land, being also the Northeasterly corner of Lot 50 of this subdivision and being a point on the Northwesterly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 10,266.22 feet South and 12,967.69 feet East and running by azimuths measured clockwise from True South:

Thence for the next three (3) courses following along the remainder of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 1. | 171° | 30' | | 28.28 | feet along Lot 50 of this subdivision to a point; |
|---|---|---|---|---|---|
| 2. | 126° | 30' | | 30.00 | feet along Lot 50 of this subdivision to a point; |

Thence, following along Lots 50, 49, 48, 47 and 46 of this subdivision on a curve to the right with a radius of 575.00 feet, the chord azimuth and distance being:

| 3. | 144° | 13' | | 349.96 | feet to a point; |
|---|---|---|---|---|---|
| 4. | 161° | 56' | | 282.13 | feet along Lots 46, 45 and 44 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II, Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu and Grant 3630 to W.H. Cornwell to a point; |

Thence, following along Lots 44 and 43 of this subdivision and along the remainder of Lot 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the left with a radius of 40.00 feet, the chord azimuth and distance being:

| 5. | 141° | 52' | 26" | 27.44 | feet to a point; |
|---|---|---|---|---|---|

EXHIBIT A
Page 3 of 16

(3

Thence, following along Lots 43, 42, 41 and 40 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the right with a radius of 45.00 feet, the chord azimuth and distance being:

6.   186°   52'   26"            81.61      feet to a point;

Thence, following along Lots 40, 39 and 38 of this subdivision and along the remainder of Lots 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the right with a radius of 45.00 feet, the chord azimuth and distance being:

7.   316°   59'   35"            81.61      feet to a point;

Thence, following along Lot 38 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the left with a radius of 40.00 feet, the chord azimuth and distance being:

8.     1°   59'   35"            27.44      feet to a point;

9.   341°   56'                 282.13      feet along Lots 38, 37 and 36 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II, Grant 3630 to W.H. Cornwell and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to a point;

Thence, for the next three (3) courses following along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following along Lots 35, 34 and 33 of this subdivision on a curve to the left with a radius of 525.00 feet, the chord azimuth and distance being:

10.  324°   13'                 319.53      feet to a point;

11.  306°   30'                  30.00      feet along Lot 33 of this subdivision to a point;

EXHIBIT A
Page 4 of 16

14

Thence, following along Lot 33 of this subdivision on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 12. | 261° | 30' | 28.28 | feet to a point; |
|---|---|---|---|---|
| 13. | 36° | 30' | 90.00 | feet along the Northwesterly side of Lako Street to the point of beginning and containing an area of 40,823 Square Feet. |

## ROAD G
### 'IOLANI, INCREMENT IV, PHASE II

Land situated on the Northwesterly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii. Being portions of Lot 77 of 'Iolani, Increment III, Phase II; Grant 3630 to W.H. Cornwell; Grant 1592 to Kealalio; and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at the Southeasterly corner of this parcel of land, being also the Southeasterly corner Lot 28 of this subdivision and being a point on the Westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,824.10 feet South and 13,294.85 feet East and running by azimuth measured clockwise from True South:

| 1. | 36° | 30' | 60.00 | feet along the Westerly side of Lako Street to a point; |
|---|---|---|---|---|

Thence, from a tangent azimuth of 216° 30', following along Lot 32 of this subdivision on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 2. | 171° | 30' | 28.28 | feet to a point; |
|---|---|---|---|---|
| 3. | 126° | 30' | 30.00 | feet along Lot 32 of this subdivision to a point; |

Thence, following along Lots 32 and 31 of this subdivision on a curve to the right with a radius of 410.00 feet, the chord azimuth and distance being:

| 4. | 140° | 37' | 200.00 | feet to a point; |
|---|---|---|---|---|
| 5. | 154° | 44' | 103.44 | feet along Lots 31 and 30 of this subdivision to a point; |

### EXHIBIT A
Page 5 of 16

15

Thence, for the next (4) courses following along Lot 30:

| | | | | |
|---|---|---|---|---|
| 6. | 244° | 44' | 20.00 | feet to a point; |
| 7. | 334° | 44' | 30.33 | feet to a point; |

Thence, following on a curve to the left with a radius of 10.00 feet, the chord azimuth and distance being;

| | | | | |
|---|---|---|---|---|
| 8. | 289° | 44' | 14.14 | feet to a point; |
| 9. | 244° | 44' | 10.00 | feet to a point; |
| 10. | 334° | 44' | 20.00 | feet along Lot 29 of this subdivision to a point; |

Thence, for the next six (6) courses following along Lot 28:

| | | | | |
|---|---|---|---|---|
| 11. | 64° | 44' | 10.00 | feet to a point; |

Thence, following on a curve to the left with a radius of 10.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 12. | 19° | 44' | 14.14 | feet to a point; |
| 13. | 334° | 44' | 33.11 | feet to a point; |

Thence, following on a curve to the left with a radius of 390.00 feet, the chord azimuth and distance being;

| | | | | |
|---|---|---|---|---|
| 14. | 320° | 37' | 190.24 | feet to a point; |
| 15. | 306° | 30' | 30.00 | feet to a point; |

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 16. | 261° | 30' | 28.28 | feet to the point of beginning and containing an area of 7,625 Square Feet. |

**EXHIBIT A**
Page 6 of 16

16

BEING THE PREMISES ACQUIRED BY LIMITED WARRANTY DEED

GRANTOR:     NASHER INVESTMENT CORPORATION, a Texas corporation

GRANTEE:     MARYL DEVELOPMENT, INC., a Hawaii corporation

DATED:       December 22, 1989
RECORDED:    Liber 24067  Page 738

**SUBJECT HOWEVER TO:**

1.   Reservation in favor of the State of Hawaii of all mineral and metallic mines.

2.   Covenants, conditions, restrictions, reservations, agreements, obligations, easements and other provisions set forth in the following:

INSTRUMENT:   DEED

DATED:        November 2, 1978
RECORDED:     Liber 13256  Page 114

3.   The terms and provisions, including the failure to comply with any covenants, conditions and reservations, contained in the following:

INSTRUMENT:   DECLARATION OF PROTECTIVE COVENANTS, CONDITIONS AND RESTRICTIONS FOR 'IOLANI

DATED:        November 4, 1991
RECORDED:     Document No. 92-007510

Said Declaration was amended by instruments dated July 23, 1992, recorded as Document No. 92-137323, dated September 25, 1992, recorded as Document No. 92-162609, dated December 14, 1992, recorded as Document No. 93-008468, dated December 3, 1998, recorded as Document No. 98-186759, and dated January 31, 2000, recorded as Document No. 2000-015362.

AMENDMENT TO THE BY-LAWS OF 'IOLANI COMMUNITY ASSOCIATION dated April 15, 2003, recorded as Document No. 2003-123472.

**EXHIBIT A**
Page 7 of 16

4.    A RESERVATION AND EXCEPTION in favor of the Seller as to easements for roadway, drainage, water, planting screen and utility purposes as hereinbelow described or as provided for in the Limited Warranty Deed attached hereto, reserving and excepting the right to construct, reconstruct, install, reinstall, maintain, operate, repair, replace and remove such structures, systems, culverts, ditches, pipes, lines and other appurtenant facilities and equipment as the same may be appropriate to the designation of the type of easement as aforesaid, through, under, over and across said easements, together with the right to use and dispose of, in the Seller's sole discretion, all materials resulting from any excavation work in connection with the foregoing activities, and together also with the right of ingress to and egress from said easements over the Buyer's adjacent property for the purposes aforesaid, which said easements and rights and roadway, drainage, electrical or water structures, systems, ditches, pipes, lines and other appurtenant facilities and equipment, the Seller and its successors and assigns, may in its sole and exclusive discretion, by virtue of this exception and reservation and the right and authority of the Seller by reason hereof, assign or grant to the United States of America, the State of Hawaii, the County of Hawaii or other governmental agency or any public or private utility or other corporation or person upon or under such terms and conditions as the Seller may determine or as shall be specified by such governmental agency, public or private utility or other corporation or person in connection with their acceptance of the same, and any such assignment or grant may be without joinder of or notice to the Buyer herein; and the Buyer herein, by acceptance of the Limited Warranty Deed attached hereto, hereby covenants and agrees that the Buyer will, if, as and when requested by the Seller, join in such assignment or grant to such governmental agency, public or private utility or other corporation or person.

5.    The terms and provisions, including the failure to comply with any covenants, conditions and reservations, contained in the following:

INSTRUMENT:      REALIGNMENT AND DEDICATION AGREEMENT

DATED:           February 11, 1992
RECORDED:        Document No. 92-050143
PARTIES:         MARYL DEVELOPMENT, INC., a Hawaii corporation, ROBERT
                 L. HIND, III, MICHAEL T. HIND, FRANCIS W. HIND, and
                 JENNIFER L. HIND, also known as JENNIFER L. MITCHELL, and
                 ROBERT L. HIND, III, MICHAEL T. HIND and FRANCIS W.
                 HIND, as Successor Trustees of the R. L. Hind, Jr. Trust created by
                 unrecorded Trust Agreement dated July 23, 1982, as amended,
                 PATRICIA H. NAGLE, as Trustee under that certain Trust created
                 under the Last Will and Testament of Marjorie S. Hearst dated
                 August 18, 1972, ROY G. NAGLE, as Trustee under that certain
                 unrecorded Revocable Trust of Roy G. Nagle, dated September 11,
                 1989, a Memorandum of which is recorded as Document No. 90-
                 097110, and PATRICIA H. NAGLE, as Trustee under that certain

EXHIBIT A
·Page 8 of 16

18

unrecorded Revocable Trust of Patricia H. Nagle, dated September 11, 1989, a Memorandum of which is recorded as Document No. 90-097111 and STEVEN RYAN SHERMAN and LINDA KAY SHERMAN, husband and wife, as Trustees of The Sherman Family Revocable Trust Agreement dated August 28, 1986

6.   Grant of Easement and Bill of Sale dated May 15, 1992, and recorded in said Bureau as Document No. 92-100275, with respect to the operation and maintenance of the water system within the Subdivision Roads.

7.   Grant of Easement and Bill of Sale dated July 27, 1993, and recorded in said Bureau as Document No. 93-129599, with respect to the operation and maintenance of the water system within the Subdivision Roads.

8.   Grant of Easement and Bill of Sale dated June 6, 2000, and recorded in said Bureau as Document No. 2000-080777, with respect to the operation and maintenance of the water system within the Subdivision.

9.   Grant of Easement and Bill of Sale dated August 2, 2000, and recorded in said Bureau as Document No. 2000-110021, with respect to the operation and maintenance of the water system within the Subdivision.

10.  Grant of Easement and Bill of Sale dated _____, 2004, and recorded in said Bureau as Document No. 2004-_____, with respect to the operation and maintenance of the water system within the Subdivision.

11.  GRANT

     TO:            HAWAII ELECTRIC LIGHT COMPANY, INC. and GTE HAWAIIAN TELEPHONE COMPANY INCORPORATED

     DATED:         May 30, 2000
     RECORDED:      Document No. 2000-091025
     GRANTING:      a perpetual right and easement to build, construct, reconstruct, rebuild, repair, maintain and operate underground lines and transformer vaults, and to use such conduits and other appliances and equipment as may be necessary for the transmission and distribution of electricity to be used for light, power and/or communications and control circuits, including the right to trim and keep trimmed any tree or trees in the way of their appliances and equipment, and including also the right of entry upon the premises for the construction, maintenance, repair and operation of said equipment, transformer

**EXHIBIT A**
Page 9 of 16

19

vaults, and/or underground lines, in order to keep them in efficient use and condition.

12.   The terms and provisions, including the failure to comply with any covenants, conditions and reservations, contained in the following:

INSTRUMENT:      AGREEMENT

DATED:           February 21, 1995
RECORDED:        Document No. 95-031841
PARTIES:         THE WATER COMMISSION OF THE COUNTY OF HAWAII and MARYL DEVELOPMENT, INC., a Hawaii corporation
RE:              private landscape irrigation system and related facilities

13.   The terms and provisions, including the failure to comply with any covenants, conditions and reservations, contained in the following:

INSTRUMENT:      AGREEMENT

DATED:           December 3, 2003
RECORDED:        Document No. 2003-285479
PARTIES:         COUNTY OF HAWAII and MARYL GROUP, INC., a Hawaii corporation
RE:              subdivision improvements

14.   EXISTING EASEMENT "4"

PURPOSE:         sight distance
SHOWN:           as shown on survey map dated September 30, 1999, revised July 19, 2000

15.   DESIGNATION OF EASEMENT "P-2" (10 ft. wide)

PURPOSE:         for planting screen (No Vehicular Access Permitted)
SHOWN:           as shown on survey map dated October 29, 2003, revised June 14, 2004, and more particularly described as follows:

EASEMENT "P-2"
(10-FT. WIDE)
FOR PLANTING SCREEN PURPOSES
(NO VEHICULAR ACCESS PERMITTED)
OVER AND ACROSS LOT 28
OF 'IOLANI, INCREMENT IV, PHASE II

**EXHIBIT A**
Page 10 of 16

26

Land situated on the Easterly side of Lot 28 and along the Westerly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii.

Being portions of:

> Lot 28 of 'Iolani, Increment IV, Phase II
> Grant 1592 to Kealalio; and
> Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at the Northeasterly corner of this easement, being also at the Northeasterly corner of Lot 28, the Southeasterly corner of Lot 29 and being a point on the Westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,517.67 feet South and 13,329.79 feet East and running by azimuths measured clockwise from True South:

Thence, for the next four (4) courses following along the Westerly side of Lako Street:

Thence, from a tangent azimuth of 345° 24' 54" following on a curve to the left with a radius of 720.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 1. | 344° | 53' | 12" | 13.28 | feet to a point; |
| 2. | 344° | 21' | 30" | 50.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 270.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 3. | 10° | 25' | 45" | 237.32 | feet to a point; |
| 4. | 36° | 30' | | 15.00 | feet to a point; |

Thence, following along the Easterly side of Road Lot G of this subdivision on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 5. | 66° | 30' | 20.00 | feet to a point; |

Thence, for the next four (4) courses following along the remainder of Lot 28:

| | | | | |
|---|---|---|---|---|
| 6. | 216° | 30' | 32.32 | feet to a point; |

**EXHIBIT A**
Page 11 of 16

21

Thence, following on a curve to the left with a radius of 260.00 feet, the chord azimuth and distance being:

| 7. | 190° | 25' | 45" | 228.53 | feet to a point; |
| 8. | 164° | 21' | 30" | 50.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 730.00 feet, the chord azimuth and distance being:

| 9. | 164° | 48' | 45" | 11.57 | feet to a point; |
| 10. | 244° | 44' | | 10.17 | feet along Lot 29 of this subdivision to the point of beginning and containing an area of 3,309 Square Feet. |

16.   DESIGNATION OF EASEMENT "SD-1"

PURPOSE:        sight distance
SHOWN:          as shown on survey map dated October 29, 2003, revised June 14, 2004, and more particularly described as follows:

EASEMENT "SD-1"
FOR SIGHT DISTANCE PURPOSES
AFFECTING LOT 28
OF 'IOLANI, INCREMENT IV, PHASE II

Land situated on the Easterly boundary of Lot 28 and along the Westerly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii.

Being portions of:

Lot 28 of 'Iolani, Increment IV, Phase II
Grant 1592 to Kealalio; and
Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at the Southeasterly corner of this easement, being also an angle point on the Southerly boundary of Lot 28, the Southeasterly corner of Road Lot G of this subdivision and a point on the Westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,824.10 feet South and 13,294.85 feet East and running by azimuths measured clockwise from True South:

EXHIBIT A
Page 12 of 16

Thence, from a tangent azimuth of 36° 30' following along the Easterly side of Road Lot G of this subdivision on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 1. | 66° | 30' | | 20.00 | feet to a point; |
| 2. | 193° | 35' | 09" | 257.95 | feet along the remainder of Lot 28 to a point; |
| 3. | 254° | 21' | 30" | 10.00 | feet along the remainder of Lot 28 to a point; |

Thence, from a tangent azimuth of 344° 21' 30" following along the Westerly side of Lako Street on a curve to the right with a radius of 270.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 4. | 10° | 25' | 45" | 237.32 | feet to a point; |
| 5. | 36° | 30" | | 15.00 | feet along the Westerly side of Lako Street to the point of beginning and containing an area of 8,381 Square Feet. |

17.   DESIGNATION OF EASEMENT "U-5"

PURPOSE:   utility
SHOWN:   as shown on survey map dated October 29, 2003, revised June 14, 2004, and more particularly described as follows:

EASEMENT "U-5"
FOR UTILITY PURPOSES
OVER AND ACROSS LOT 28
OF 'IOLANI, INCREMENT IV, PHASE II

Land situated on the Westerly boundary of Lot 28 and along the Easterly side of Road Lot G at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii.

Being portions of:

Lot 28 of 'Iolani, Increment IV, Phase II; and
Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

EXHIBIT A
Page 13 of 16

Beginning at a point on the Northerly side of this easement, being also a point on the Northerly boundary of Lot 28, the Southwesterly corner of Lot 29 and being a point on the Easterly side of Road Lot G of this subdivision, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,615.87 feet South and 13,121.74 feet East and running by azimuths measured clockwise from True South:

| | | | | |
|---|---|---|---|---|
| 1. | 244° | 44' | 4.00 | feet along Lot 29 of this subdivision to a point; |

Thence, for the next six (6) courses following along the remainder of Lot 28:

| | | | | |
|---|---|---|---|---|
| 2. | 334° | 44' | 4.00 | feet to a point; |
| 3. | 64° | 44' | 14.00 | feet to a point; |

Thence, following on a curve to the left with a radius of 6.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 4. | 19° | 44' | 8.49 | feet to a point; |
| 5. | 334° | 44' | 33.11 | feet to a point; |

Thence, following on a curve to the left with a radius of 386.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 6. | 320° | 37' | 188.29 | feet to a point; |
| 7. | 306° | 30' | 40.00 | feet to a point; |
| 8. | 36° | 30' | 1.32 | feet to a point; |

Thence, for the next six (6) courses following along the Easterly side of Road Lot G of this subdivision:

Thence, from a tangent azimuth of 96° 30' following on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 9. | 111° | 30' | 10.35 | feet to a point; |
| 10. | 126° | 30' | 30.00 | feet to a point; |

EXHIBIT A
Page 14 of 16

Thence, following on a curve to the right with a radius of 390.00 feet, the chord azimuth and distance being:

| 11. | 140° | 37' | 190.24 | feet to a point; |
| 12. | 154° | 44' | 33.11 | feet to a point; |

Thence, following on a curve to the right with a radius of 10.00 feet, the chord azimuth and distance being:

| 13. | 199° | 44' | 14.14 | feet to a point; |
| 14. | 244° | 44' | 10.00 | feet to the point of beginning and containing an area of 1,155 Square Feet. |

18.   DESIGNATION OF EASEMENT "F-1"

PURPOSE:   fire hydrant
SHOWN:   as shown on survey map dated October 29, 2003, revised June 14, 2004, and more particularly described as follows:

EASEMENT "F-1"
FOR FIRE HYDRANT PURPOSES
AFFECTING LOT 28
OF 'IOLANI, INCREMENT IV, PHASE II

Land situated on the Westerly boundary of Lot 28 and along the Easterly side of Road Lot G at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii.

Being portions of:

Lot 28 of 'Iolani, Increment IV, Phase II; and
Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at a point on the Westerly side of this easement, being also an angle point on the Westerly boundary of Lot 28 and an angle point on the Easterly side of Road Lot G of this subdivision, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,663.39 feet South and 13,122.05 feet East and running by azimuths measured clockwise from True South:

| 1. | 154° | 44' | 15.00 | feet along the Easterly side of Road Lot G of this subdivision to a point; |

EXHIBIT A
Page 15 of 16

25

Thence, for the next three (3) courses following along the remainder of Lot 28:

| | | | | |
|---|---|---|---|---|
| 2. | 244° | 44' | 7.00 | feet to a point; |
| 3. | 334° | 44' | 20.00 | feet to a point; |
| 4. | 64° | 44' | 6.97 | feet to a point; |

Thence, from a tangent azimuth of 154° 00' following along the Easterly side of Road Lot G of this subdivision on a curve to the right with a radius of 390.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 5. | 154° | 22' | 4.99 | feet to the point of beginning and containing an area of 140 Square Feet. |

## END OF EXHIBIT A

EXHIBIT A
Page 16 of 16

26



Mixed Sources
www.fsc.org  Cert no. SW-COC-002989
FSC  © 1996 Forest Stewardship Council

BURDGECOOPER  www.burdgecooper.com
Los Angeles 800-421-8700  •  Atlanta 800-326-7600



R-224    STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
SEP 20, 2005        08:01 AM

Doc No(s) 2005-188824

/s/ CARL T. WATANABE
REGISTRAR OF CONVEYANCES

35     1/1     Z3

After Recordation Return By:    Mail ☐    Pickup ☐    To:

COUNTRYWIDE HOME LOANS, INC.          TG: 2006357916R              R S
MS SV-79 DOCUMENT PROCESSING          TGE: AG-301-1352
P.O.Box 10423                                  35 pgs
Van Nuys, CA 91410-0423                  Marcia DeLima



Prepared by:
CHRISTINA CAMERON

——————————— [Space Above This Line For Recording Data] ———————————

NOTTAGE                          0008745884309005
[Escrow/Closing #]                  [Doc ID #]

# MORTGAGE
MIN 1000157-0005061572-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections

HAWAII-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 15

VMP -6A(HI) (0005).01    CHL (08/00)(d)    VMP MORTGAGE FORMS - (800)521-7291        Initials: ___    Form 3012 1/01
CONV/VA



* 23991 *



* 0 8 7 4 5 8 8 4 3 0 0 0 0 0 1 0 0 6 A *

 

DOC ID #: 0008745884309005

3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated SEPTEMBER 15, 2005 , together with all Riders to this document.

(B) "Borrower" is

PETER B NOTTAGE JR, AND JENNIFER NOTTAGE, AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is

COUNTRYWIDE HOME LOANS, INC.

Lender is a CORPORATION

organized and existing under the laws of NEW YORK

Lender's address is

P.O. Box 10219, Van Nuys, CA 91410-0219

(E) "Note" means the promissory note signed by Borrower and dated SEPTEMBER 15, 2005 . The Note states that Borrower owes Lender

ONE MILLION FOUR HUNDRED THIRTY SEVEN THOUSAND and 00/100

Dollars (U.S. $ 1,437,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 01, 2036 .

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Construction Loan Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an

DOC ID #: 0008745884309005

account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfer

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

| COUNTY | of | HAWAII |
| --- | --- | --- |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction]: |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 3712                                  which currently has the address of
              76-863 NORTH PAKALAKALA PLACE,  KAILUA KONA                          ,
                                        [Street/City]

Hawaii      96740      ("Property Address"):
        [Zip Code]

Initials: _____

DOC ID #: 0008745884309005

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

Initials:

Form 3012 1/01

DOC ID #: 0008745884309005

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Initials: _____

DOC ID #: 0008745884309005

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Initials:

Form 3012 1/01

-6A(HI) (0005).01    CHL (08/00)          Page 6 of 15

DOC ID #: 0008745884309005

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Initials: _____

-6A(HI) (0005).01     CHL (08/00)          Page 7 of 15          Form 3012 1/01

DOC ID #: 0008745884309005

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

Initials: _____

-6A(HI) (0005).01     CHL (08/00)          Page 8 of 15                    Form 3012 1/01

DOC ID #: 0008745884309005

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this

Initials: [handwritten initials]

DOC ID #: 0008745884309005

Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and

Initials: _____

-6A(HI) (0005).01     CHL (08/00)          Page 10 of 15                    Form 3012 1/01

DOC ID #: 0008745884309005

agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials: _____

-6A(HI) (0005).01   CHL (08/00)                     Page 11 of 15                                                   Form 3012 1/01

DOC ID #: 0008745884309005

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

Initials: _____

-6A(HI) (0005).01    CHL (08/00)                    Page 12 of 15                                   Form 3012 7/01

DOC ID #: 0008745884309005

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give Borrower notice of sale in the manner provided in Section 15. Lender shall publish a notice of sale and shall sell the Property at the time and place and under the terms specified in the notice of sale. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

DOC ID #: 0008745884309005

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower relinquishes all right of dower and curtesy in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____(Seal)
                                     PETER B. NOTTAGE JR              -Borrower

_____     _____(Seal)
                                     JENNIFER NOTTAGE                 -Borrower

                                     _____(Seal)
                                                                      -Borrower

                                     _____(Seal)
                                                                      -Borrower

STATE OF HAWAII, *County g Hewau*   DOC ID #: 0008745884309005
   ss:

On this   *15 th* day of *September 2007*   , before me personally appeared

## Peter B. Nottage, Jr. and Jennifer Nottage

to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she/(they) executed the same as his/her/their free act and deed.

My Commission Expires:

*48*

_____
Notary Public, State of Hawaii

_____
Notary Name

**KRISTINE H. FREITAS**
**NOTARY PUBLIC, STATE OF HAWAII**
**NO. 95-515**
**COMMISSION EXPIRES: DECEMBER 7, 2007**

Initials: _____

Form 3012 1/01

TMK: (3) 7-6-012-007

## EXHIBIT "A"

All of that certain parcel of land (being portion(s) of the land(s) described in and covered by Royal Patent Grant Number 1592 to Kealalio, Royal Patent Number 4475, Land Commission Award Number 7713, Apana 43 to V. Kamamalu, and Land Patent Grant Number 3630 to W.H. Cornwell) situate, lying and being on the northwesterly side of Lako Street and on the southwesterly side of Road Lot G at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii, being LOT 28 of "IOLANI, INCREMENT IV, PHASE II", same being a portion of Lot 77 of "Iolani, Increment III, Phase II", and thus bounded and described as follows:

Beginning at the northeasterly corner of this parcel of land, being also the southeasterly corner of Lot 29 of this subdivision and being a point on the westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,517.67 feet south and 13,329.79 feet east and running by azimuths measured clockwise from true South:

> Thence, for the next four (4) courses following along the westerly side of Lako Street:

> Thence, from a tangent azimuth of 345° 24' 54" following on a curve to the left with a radius of 720.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 1. | 344° | 53' | 12" | 13.28 | feet to a point; |
| 2 | 344° | 21' | 30" | 50.00 | feet to a point; |

> Thence, following on a curve to the right with a radius of 270.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 3. | 10° | 25' | 45" | 237.32 | feet to a point; |
| 4. | 36° | 30' | | 15.00 | feet to a point; |

EXHIBIT A CONTINUED

Thence, for the next five (5) courses following along the easterly side of Road Lot G of this subdivision:

Thence, following on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 5. | 81° | 30' | 28.28 | feet to a point; |
| 6. | 126° | 30' | 30.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 390.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 7. | 140° | 37' | 190.24 | feet to a point; |
| 8. | 154° | 44' | 33.11 | feet to a point; |

Thence, following on a curve to the right with a radius of 10.00 feet, the chord azimuth and distance being:

| | | | | |
|---|---|---|---|---|
| 9. | 199° | 44' | 14.14 | feet to a point; |
| 10. | 244° | 44' | 240.06 | feet along the easterly side of Road Lot G and along Lot 29 of this subdivision and along the remainders of Lot 77 of `Iolani, Increment III, Phase II, Grant 1592 to Kealalio and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to the point of beginning and containing an area of 1.111 acres, more or less. |

EXHIBIT A CONTINUED

Together with easements over, across and along Roads B, D, E, F, G, H, I, J and K within all Increments of said "IOLANI SUBDIVISION", said Road B being more particularly described in Exhibit "B" attached to instrument dated May 15, 1992, recorded as Document No. 92-100275, Roads D, E and F being more particularly described in Exhibits "A", "B" and "C", respectively, attached to instrument dated July 27, 1993, recorded as Document No. 93-129599. Said Roads G and H being more particularly described below and Roads I, J and K, all being more particularly described in that certain instrument dated January 3, 2003, recorded as Document No. 2003-002769; provided that in the event said Road B, D, E, F, G, H, I, J and K, or any one or more of said Roads are conveyed, transferred and dedicated to any governmental authority and accepted as public highways, the foresaid easements as to such dedicated Roads shall cease and terminate.

ROAD H
'IOLANI, INCREMENT IV, PHASE I

Land situated on the Northwesterly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii. Being portion of Lot 77 of 'Iolani, Increment III, Phase II; Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu; and Grant 3630 to W.H. Cornwell.

Beginning at the southwesterly corner of this parcel of land, being also the northeasterly corner of Lot 50 of this subdivision and being a point on the Northwesterly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 10,266.22 feet south and 12,967.69 feet east and running by azimuths measured clockwise from true South:

Thence for the next three (3) courses following along the remainder of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

1.   171°   30'              28.28        feet along Lot 50 of this subdivision to a point;

EXHIBIT A CONTINUED

2.  126°  30'            30.00       feet along Lot 50 of this
                                     subdivision to a point;

    Thence, following along Lots 50, 49, 48, 47 and 46 of this
                                     subdivision on a curve to the
                                     right with a radius of 575.00
                                     feet, the chord azimuth and
                                     distance being:

3.  144°  13'            349.96      feet to a point;

4.  161°  56'            282.13      feet along Lots 46, 45 and 44 of
                                     this subdivision and along the
                                     remainders of Lot 77 of 'Iolani,
                                     Increment III, Phase II, Royal
                                     Patent 4475, Land Commission
                                     Award 7713, Apana 43 to V.
                                     Kamamalu and Grant 3630 to W.H.
                                     Cornwell to a point;

    Thence, following along Lots 44 and 43 of this subdivision and
                                     along the remainder of Lot 77 of
                                     'Iolani, Increment III, Phase II
                                     and Grant 3630 to W.H. Cornwell
                                     on a curve to the left with a
                                     radius of 40.00 feet, the chord
                                     azimuth and distance being:

5.  141°  52'  26"       27.44       feet to a point;

    Thence, following along Lots 43, 42, 41 and 40 of this subdivision
                                     and along the remainders of Lot
                                     77 of 'Iolani, Increment III,
                                     Phase II and Grant 3630 to W.H.
                                     Cornwell on a curve to the right
                                     with a radius of 45.00 feet, the
                                     chord azimuth and distance being:

6.  186°  52'  26"       81.61       feet to a point;

EXHIBIT A CONTINUED


Thence, following along Lots 40, 39 and 38 of this subdivision and along the remainder of Lots 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the right with a radius of 45.00 feet, the chord azimuth and distance being:

7.    316°   59'   35"    81.61    feet to a point;

Thence, following along Lot 38 of this subdivision and along the remainder of Lot 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the left with a radius of 40.00 feet, the chord azimuth and distance being:

8.    1°   59'   35"    27.44    feet to a point;

9.    341°   56'    282.13    feet along Lots 38, 37 and 36 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II, Grant 3630 to W.H. Cornwell and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to a point;

Thence, for the next three (3) courses following along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following along Lots 35, 34 and 33 of this subdivision on a curve to the left with a radius of 525.00 feet, the chord azimuth and distance being:

10.    324°   13'    319.53    feet to a point;

EXHIBIT A CONTINUED


11.  306°  30'           30.00     feet along Lot 33 of this
                                   subdivision to a point;

     Thence, following along Lot 33 of this subdivision on a curve to
                                   the left with a radius of 20.00
                                   feet, the chord azimuth and
                                   distance being:

12.  261°  30'           28.28     feet to a point;

13.   36°  30'           90.00     feet along the Northwesterly side
                                   of Lako Street to the point of
                                   beginning and containing an area
                                   of 40,823 square feet, more or
                                   less.


ROAD G
'IOLANI, INCREMENT IV, PHASE II

Land situated on the northwesterly side of Lako Street at Holualoa 1st
and 2nd, North Kona, Island and County of Hawaii, State of Hawaii.
Being portions of Lot 77 of 'Iolani, Increment III, Phase II; Grant
3630 to W.H. Cornwell; Grant 1592 to Kealalio; and  Royal Patent 4475,
Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at the southeasterly corner of this parcel of land, being
also the southeasterly corner Lot 28 of this subdivision and being a
point on the Westerly side of Lako Street, the coordinates of said
point of beginning referred to Government Survey Triangulation Station
"KAILUA (NORTH MERIDIAN)" being 9,824.10 feet south and 13,294.85 feet
east and running by azimuth measured clockwise from true South:

1.   36°   30'           60.00     feet along the Westerly side of
                                   Lako Street to a point;

     Thence, from a tangent azimuth of 216° 30', following along Lot 32
                                   of this subdivision on a curve to
                                   the left with a radius of 20.00
                                   feet, the chord azimuth and
                                   distance being:

EXHIBIT A CONTINUED

2.    171°    30'              28.28      feet to a point;

3.    126°    30'              30.00      feet along Lot 32 of this
                                          subdivision to a point;

      Thence, following along Lots 32 and 31 of this subdivision on a
                                          curve to the right with a radius
                                          of 410.00 feet, the chord azimuth
                                          and distance being:

4.    140°    37'             200.00      feet to a point;

5.    154°    44'             103.44      feet along Lots 31 and 30 of this
                                          subdivision to a point;

      Thence, for the next (4) courses following along Lot 30:

6.    244°    44'              20.00      feet to a point;

7.    334°    44'              30.33      feet to a point;

      Thence, following on a curve to the left with a radius of 10.00
                                          feet, the chord azimuth and
                                          distance being;

8.    289°    44'              14.14      feet to a point;

9.    244°    44'              10.00      feet to a point;

10.   334°    44'              20.00      feet along Lot 29 of this
                                          subdivision to a point;

      Thence, for the next six (6) courses following along Lot 28:

11.   64°     44'              10.00      feet to a point;

      Thence, following on a curve to the left with a radius of 10.00
                                          feet, the chord azimuth and
                                          distance being:

12.   19°     44'              14.14      feet to a point;

13.   334°    44'              33.11      feet to a point;

EXHIBIT A CONTINUED

Thence, following on a curve to the left with a radius of 390.00 feet, the chord azimuth and distance being;

| 14. | 320° | 37' | 190.24 | feet to a point; |
| 15. | 306° | 30' | 30.00 | feet to a point; |

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 16. | 261° | 30' | 28.28 | feet to the point of beginning and containing an area of 7,625 square feet, more or less. |

BEING THE PREMISES ACQUIRED BY LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS

GRANTOR    :   MARYL GROUP, INC., formerly known as Maryl Development, Inc., a Hawaii corporation

GRANTEE    :   PETER B. NOTTAGE, JR. and JENNIFER A. NOTTAGE, husband and wife, as Tenants by the Entirety

DATED      :   October 18, 2004
RECORDED   :   Document No. 2004-217525

Subject to any and all liens and/or encumbrances of record.

# ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

PARCEL ID #:
3712

Prepared By:
CHRISTINA CAMERON


NOTTAGE              0008745884309005
[Escrow/Closing #]        [Doc ID #]

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae
UNIFORM INSTRUMENT                    Page 1 of 5                    Initials:
VMP®-166R (0401)      CHL (06/04)(d)                                        Form 3189 6/01
                VMP Mortgage Solutions, Inc. (800)521-7291





DOC ID #: 0008745884309005

THIS ADJUSTABLE RATE RIDER is made this FIFTEENTH day of SEPTEMBER, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

76-863 NORTH PAKALAKALA PLACE, KAILUA KONA, HI 96740

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          5.750 %. The Note provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of OCTOBER, 2007     , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

Initials: _____

Form 3189 6/01

DOC ID #: 0008745884309005

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.750 % or less than 3.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

-166R (0401)    CHL (06/04)        Page 3 of 5                    Initials: ___    Form 3189 6/01

DOC ID #: 0008745884309005

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials:

DOC ID #: 0008745884309005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
PETER B. NOTTAGE JR                                          - Borrower

_____ (Seal)
JENNIFER NOTTAGE                                            - Borrower

_____ (Seal)
                                                           - Borrower

_____ (Seal)
                                                           - Borrower

-166R (0401)        CHL (06/04)        Page 5 of 5              Form 3189 6/01

# PLANNED UNIT DEVELOPMENT RIDER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

PARCEL ID #:
3712

Prepared By:
CHRISTINA CAMERON

| NOTTAGE | 0008745884309005 |
|---|---|
| [Escrow/Closing #] | [Doc ID #] |

THIS PLANNED UNIT DEVELOPMENT RIDER is made this FIFTEENTH            day of
SEPTEMBER,  2005 , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the

MULTISTATE PUD RIDER - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

@ -7R (0411)     CHL (11/04)(d)        Page 1 of 4                              Initials:
VMP Mortgage Solutions, Inc. (800)521-7291                        **Form 3150  1/01**

*23991*                    *08745884300000100 7R*

DOC ID #: 0008745884309005

undersigned (the "Borrower") to secure Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

76-863 NORTH PAKALAKALA PLACE
KAILUA KONA, HI 96740
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

(the "Declaration"). The Property is a part of a planned unit development known as
IOLANI

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

Initials: _____

-7R (0411)      CHL (11/04)           Page 2 of 4                    Form 3150 1/01

DOC ID #: 0008745884309005

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

DOC ID #: 0008745884309005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
PETER B. NOTTAGE JR                                                      - Borrower

_____ (Seal)
JENNIFER NOTTAGE                                                        - Borrower

_____ (Seal)
                                                                                      - Borrower

_____ (Seal)
                                                                                      - Borrower

-7R (0411)          CHL (11/04)          Page 4 of 4                    Form 3150  1/01

After Recordation Return By:     Mail [X]   Pickup [ ]   To:

    COUNTRYWIDE HOME LOANS, INC.
    MS SV-79 DOCUMENT PROCESSING
    P.O.Box 10423
    Van Nuys, CA 91410-0423

Prepared by:
CHRISTINA CAMERON

———————————————[Space Above This Line For Recording Data]———————————————

                              NOTTAGE                    0008745884309005
                         [Escrow/Closing #]                  [Doc ID #]

## MORTGAGE RIDER
## FOR CONSTRUCTION LOAN

    THIS MORTGAGE RIDER FOR CONSTRUCTION LOAN (this "Rider") is made as of
09/15/2005        , and is incorporated into and shall be deemed to amend and supplement the
Mortgage or Security Deed (the "Security Instrument") of the same date given by the undersigned
("Borrower") to secure Borrower's Note (the "Note") to
COUNTRYWIDE HOME LOANS, INC.
(the "Lender") and covering the property described in the Security Instrument and located at:
76-863 NORTH PAKALAKALA PLACE, KAILUA KONA, HI 96740
(the "Property"). This mortgage is made to secure payment of monies advanced for the purposes of paying
for improvement of the Property in whole or in part.

    ADDITIONAL COVENANTS. In addition to the covenants made in the Security Instrument, Borrower
further covenants and agrees as follows:

CONV
● CCL - HI Mortgage Rider                    Page 1 of 3
1D472-HI (07/01)(d)                                          Initials: 




DOC ID #: 0008745884309005

**1. Construction Loan Agreement.** Concurrently herewith, Borrower has executed and delivered to Lender that certain Construction Loan Agreement with Security Agreement (the "Loan Agreement") and that certain Construction Loan Addendum to Note (the "Addendum"). The Security Instrument shall also secure Borrower's performance of Borrower's payment and performance of the terms and conditions of the Loan Agreement and the Addendum. A default by Borrower under the terms and conditions of the Loan Agreement or the Addendum (including but not limited to the obligation to complete the Improvements in accordance with the terms of the Loan Agreement) shall constitute a default under the Note and Security Instrument and entitle Lender to all rights and remedies thereunder. All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Loan Agreement.

**2. Advances.** The loan evidenced by the Note shall be advanced to Borrower pursuant to (and subject to the terms and conditions of) the Loan Agreement. Lender shall not be obligated to advance on a cumulative or aggregate basis any sums in excess of the face amount of the Note. The amounts secured hereunder shall include all advances under the Note, whether advanced as of the date hereof or in the future, together with such other expenditures by Lender made in accordance with the Loan Agreement or the Security Instrument, all just as if the advance or other expenditure was made on the date of this Security Instrument. The total amount of the indebtedness secured by this Security Instrument may increase or decrease from time to time, but the total unpaid balance secured by this Security Instrument shall not exceed two times the amount of the Note, together with accrued interest and all of the Lender's costs, expenses, and disbursements made under this Security Instrument. Borrower and Lender have not contracted to require written notation or evidence of each future advance to be made under the Note.

**3. Security Agreements; Fixture Filing.** As such terms are defined in the applicable Uniform Commercial Code in the State in which the Property is located (the "Uniform Commercial Code"), the "Debtor" is Borrower, having an address of the Property, and the "Secured Party" is Lender, having an address for the transaction of business as shown for Lender on the first page of the Security Instrument. The term "Property" as used in the Security Instrument shall include all items of personal property of any kind whatsoever, including, without limitation, all building materials, appliances, equipment, machinery, goods and fixtures (collectively, "personal property") now or hereafter located on or attached or affixed to the real property described therein or used in connection therewith and Borrower hereby grants to Lender a security interest in and to such personal property and all rents, profits and proceeds thereof. To the extent of the personal property encumbered by the Security Instrument, as herein modified, the Security Instrument constitutes a security agreement and is intended to create a security interest in such personal property in favor of Lender and to constitute a "fixture filing" in accordance with the provisions of the Uniform Commercial Code in favor of Lender with all rights and remedies of a secured party under the Uniform Commercial Code in the event of any breach of any covenant or agreement in the Security Instrument. The Security Instrument shall be self-operative with respect to such personal property and fixtures, but Borrower shall execute and deliver such other or additional financing statements, continuation statements, security agreements or instruments as Lender may request in order to perfect Lender's security interest in the personal property; notwithstanding however, Borrower authorizes Lender as the Secured Party to file such other financing statements or continuation statements as Lender deems appropriate, without obtaining the signature of Borrower as Debtor. The Security Instrument constitutes a fixture filing with respect to any and all fixtures or any goods which may now be or may hereafter become fixtures included within the term "Property."

**4. Miscellaneous.** Except as modified, amended or supplemented herein, all other terms and conditions of the Security Instrument shall remain unchanged and shall be applicable and govern on and after the date hereof until the Note and all amounts secured by the Security Interest shall be paid in full. Borrower shall, upon request of Lender from time to time, execute, acknowledge, deliver and/or record such additional documents, instruments and agreements as Lender may require to confirm or evidence the occurrence of the Completion Date.

**5. Adjustments.** Notwithstanding anything in the Security Instrument or Note to the contrary, if the actual Completion Date does not occur on the Scheduled Completion Date, then Lender may at its option extend or shorten the maturity date in the Note and Security Instrument to provide the same period of time for Borrower's repayment as provided in the Note. Similarly, if the total Loan Proceeds advanced and

DOC ID #: 0008745884309005

outstanding at the time of the Completion Date are less than the principal amount indicated on the Note, then Lender may at its option re-amortize the payments under the Note and reduce the Borrower's monthly payment. If Lender opts to do either of the foregoing, Lender shall give Borrower notice of such new maturity date or reduced payment amount. Borrower hereby consents to the foregoing, and no further consent is required hereafter.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

Borrower     PETER B. NOTTAGE JR

Borrower     JENNIFER NOTTAGE

Borrower

Borrower

STATE OF HAWAII, *County* *Hawaii*                            ss:

On this _____ 15th _____ day of _September 2005_ , before me personally appeared

## Peter B. Nottage, Jr. and Jennifer Nottage

to me known to be the person described in and who executed the foregoing instrument and acknowledged that *he/she/they* executed the same as *his/her/their* free act and deed.

My Commission Expires:

(Seal)

Notary Public, State of Hawaii

Notary Name

KRISTINE H. FREITAS
NOTARY PUBLIC, STATE OF HAWAII
NO. 95-515
COMMISSION EXPIRES: DECEMBER 7, 2007

CONV
● CCL - HI Mortgage Rider
1D472-HI (07/01)                     Page 3 of 3

3



Mixed Sources
www.fsc.org   Cert no. SW-COC-002980
© 1996 Forest Stewardship Council
FSC

**BURDGECOOPER**   www.burdgecooper.com
Los Angeles 800-424-8703   •   Atlanta 800-325-7680

ω



R-859   STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
AUG 29, 2006        08:02 AM

Doc No(s) 2006-158655

/s/ CARL T. WATANABE
REGISTRAR OF CONVEYANCES

20    1/1    Z9

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

RECORDED AT THE REQUEST OF
AND WHEN RECORDED MAIL TO:

COUNTRYWIDE HOME LOANS, INC.
1800 Tapo Canyon Rd., Mail Stop: SV 79
Simi Valley, CA 93063

THIS INSTRUMENT PREPARED BY:
Monica Fielder PTX 137
6400 Legacy Drive, Plano, TX 75024

TG: 200641215A
TGE: A63010095O - Mercia Delima

10 pgs

## MODIFICATION AGREEMENT TO NOTE / MORTGAGE

LOAN NUMBER: 87458843
MIN: 1000157-0005061572-9

ASSESSOR PARCEL NUMBER: 3-7-6-12-7
MERS Phone: 1-888-679-6377

This Modification Agreement (the "Agreement") is made as of August 17, 2006, between **Peter B Nottage, Jr** and **Jennifer Nottage** (the "Borrowers") and Countrywide Home Loans, Inc., dba America's Wholesale Lender, ("Lender"), Mortgage Electronic Registration Systems, Inc., ("Mortgagee"), and amends and supplements that certain Note and that certain Mortgage dated September 15, 2005, and granted or assigned to Mortgage Electronic Registration Systems, Inc., as mortgagee of record (solely as nominee for Lender and Lender's successors and assigns), P.O. Box 2026, Flint Michigan 48501-2026, and filed for record September 20, 2005, at Document No(s) 2005-188824, in the Official Records of The Bureau of Conveyances for Hawaii County, State of Hawaii (the "Security Instrument"), and covering the real property with a common street address of: **76-863 North Pakalakala Place, Kailua, HAWAII 96740**, but more specifically described as follows:

SEE ATTACHED "EXHIBIT A" ATTACHED HERETO AND INCORPORATED HEREIN.

1. The terms of the Note and Security Instrument are hereby amended and modified as follows:
   [x]  a.  the principal amount that Borrower promises to repay under the terms of the Note and that is secured by the Security Instrument *is hereby changed* to: **1,731,257.00**
   [ ]  b.  commencing on October 1, 2006, the interest on my Note shall be 5.750 percent per annum.
   [x]  c.  commencing on November 1, 2006, my regular monthly principal and interest payment under the Note shall be **$10,103.14.**
   [ ]  d.  the new Construction Completion Date is: September 15, 2006.
   [ ]  e.  the new Promissory Note Maturity Date is: October 1, 2006.
   [ ]  f.  the new first Interest Rate Change Date on the adjustable loan is: October 1, 2007.
2. Borrower consents to Lender attaching this Agreement to the Note itself.
3. All other terms and conditions of the Loan Documents shall remain unchanged and in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Security Instrument. All capitalized terms not defined herein shall have the same meanings as set forth in the Security Instrument.

Please see page 2 for Borrower(s) Acknowledgement and Notary Acknowledgement for Borrower

LOAN NUMBER: 87458843
MIN: 1000157-0005061572-9

ASSESSOR PARCEL NUMBER: 3-7-6-12-7
MERS Phone: 1-888-679-6377

(Continued)

**MODIFICATION AGREEMENT TO NOTE / MORTGAGE**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto the day and year first above written.

_____
Peter B Nottage, Jr, Marital Status -

**BORROWERS**

_____
Jennifer Nottage, Marital Status -

Notary Acknowledgement for Borrowers

State of   Hawaii

County of   Hawaii

On  August 24. 2006_____, before me, the undersigned Notary Public, personally appeared Peter B Nottage, Jr and Jennifer Nottage, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signatures on the instrument the individuals, or the entity upon behalf of which the individuals acted, executed the in
WITNESS MY HAND AND OFFICIAL SEAL

(NOTARY SEAL / STAMP)

Notary Signature  _____

BERNADINE U. HELOCA
Notary Expiration Date Expiration Date: January 6, 2010

Notary Acknowledgement for Lender and Mortgagee

State of Texas
County of Collin

Countrywide Home Loans, Inc., and
Mortgage Electronic Registration Systems, Inc.

_____
Stephen M Heintz, Vice President

On August 17 2006_____, before me, the undersigned Notary Public, personally appeared Stephen M Heintz, Vice President, Countrywide Home Loans, Inc., A New York Corporation, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.
WITNESS MY HAND AND OFFICIAL SEAL

Notary Public  _____

CARRIE PRYOR
Notary Public, State of Texas
My Commission Expires
January 31, 2010

Countrywide Home Loans, Inc. is a New York corporation.
Mortgage Electronic Registration Systems, Inc. is a Delaware corporation.

TMK: (3) 7-6-012-007

## EXHIBIT "A"

All of that certain parcel of land (being portion(s) of the land(s) described in and covered by Royal Patent Grant Number 1592 to Kealalio, Royal Patent Number 4475, Land Commission Award Number 7713, Apana 43 to V. Kamamalu, and Land Patent Grant Number 3630 to W.H. Cornwell) situate, lying and being on the northwesterly side of Lako Street and on the southwesterly side of Road Lot G at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii, being LOT 28 of "IOLANI, INCREMENT IV, PHASE II", same being a portion of Lot 77 of "Iolani, Increment III, Phase II", and thus bounded and described as follows:

Beginning at the northeasterly corner of this parcel of land, being also the southeasterly corner of Lot 29 of this subdivision and being a point on the westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,517.67 feet south and 13,329.79 feet east and running by azimuths measured clockwise from true South:

Thence, for the next four (4) courses following along the westerly side of Lako Street:

Thence, from a tangent azimuth of 345° 24' 54" following on a curve to the left with a radius of 720.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 1. | 344° | 53' | 12" | 13.28 | feet to a point; |
| 2 | 344° | 21' | 30" | 50.00 | feet to a point; |

Thence, following on a curve to the right with a radius of 270.00 feet, the chord azimuth and distance being:

| | | | | | |
|---|---|---|---|---|---|
| 3. | 10° | 25' | 45" | 237.32 | feet to a point; |

EXHIBIT A CONTINUED

4.    36°    30'              15.00      feet to a point;

    Thence, for the next five (5) courses following along the easterly side of Road Lot G of this subdivision:

    Thence, following on a curve to the right with a radius of 20.00 feet, the chord azimuth and distance being:

5.    81°    30'              28.28      feet to a point;

6.    126°   30'              30.00      feet to a point;

    Thence, following on a curve to the right with a radius of 390.00 feet, the chord azimuth and distance being:

7.    140°   37'             190.24      feet to a point;

8.    154°   44'              33.11      feet to a point;

    Thence, following on a curve to the right with a radius of 10.00 feet, the chord azimuth and distance being:

9.    199°   44'              14.14      feet to a point;

10.   244°   44'             240.06      feet along the easterly side of Road Lot G and along Lot 29 of this subdivision and along the remainders of Lot 77 of `Iolani, Increment III, Phase II, Grant 1592 to Kealalio and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to the point of beginning and containing an area of 1.111 acres, more or less.

EXHIBIT A CONTINUED

Together with easements over, across and along Roads B, D, E, F, G, H, I, J and K within all Increments of said "IOLANI SUBDIVISION", said Road B being more particularly described in Exhibit "B" attached to instrument dated May 15, 1992, recorded as Document No. 92-100275, Roads D, E and F being more particularly described in Exhibits "A", "B" and "C", respectively, attached to instrument dated July 27, 1993, recorded as Document No. 93-129599. Said Roads G and H being more particularly described below and Roads I, J and K, all being more particularly described in that certain instrument dated January 3, 2003, recorded as Document No. 2003-002769; provided that in the event said Road B, D, E, F, G, H, I, J and K, or any one or more of said Roads are conveyed, transferred and dedicated to any governmental authority and accepted as public highways, the foresaid easements as to such dedicated Roads shall cease and terminate.

ROAD H
'IOLANI, INCREMENT IV, PHASE I

Land situated on the Northwesterly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii. Being portion of Lot 77 of 'Iolani, Increment III, Phase II; Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu; and Grant 3630 to W.H. Cornwell.

Beginning at the southwesterly corner of this parcel of land, being also the northeasterly corner of Lot 50 of this subdivision and being a point on the Northwesterly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 10,266.22 feet south and 12,967.69 feet east and running by azimuths measured clockwise from true South:

Thence for the next three (3) courses following along the remainder of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 1. | 171° | 30' | | 28.28 | feet along Lot 50 of this subdivision to a point; |

EXHIBIT A CONTINUED

2.  126° 30'              30.00    feet along Lot 50 of this
                                  subdivision to a point;

        Thence, following along Lots 50, 49, 48, 47 and 46 of this
                                  subdivision on a curve to the
                                  right with a radius of 575.00
                                  feet, the chord azimuth and
                                  distance being:

3.  144° 13'             349.96   feet to a point;

4.  161° 56'             282.13   feet along Lots 46, 45 and 44 of
                                  this subdivision and along the
                                  remainders of Lot 77 of 'Iolani,
                                  Increment III, Phase II, Royal
                                  Patent 4475, Land Commission
                                  Award 7713, Apana 43 to V.
                                  Kamamalu and Grant 3630 to W.H.
                                  Cornwell to a point;

        Thence, following along Lots 44 and 43 of this subdivision and
                                  along the remainder of Lot 77 of
                                  'Iolani, Increment III, Phase II
                                  and Grant 3630 to W.H. Cornwell
                                  on a curve to the left with a
                                  radius of 40.00 feet, the chord
                                  azimuth and distance being:

5.  141° 52' 26"         27.44    feet to a point;

        Thence, following along Lots 43, 42, 41 and 40 of this
                                  subdivision and along the
                                  remainders of Lot 77 of 'Iolani,
                                  Increment III, Phase II and
                                  Grant 3630 to W.H. Cornwell on a
                                  curve to the right with a radius
                                  of 45.00 feet, the chord azimuth
                                  and distance being:

6.  186° 52' 26"         81.61    feet to a point;

EXHIBIT A CONTINUED

Thence, following along Lots 40, 39 and 38 of this subdivision and along the remainder of Lots 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the right with a radius of 45.00 feet, the chord azimuth and distance being:

7.   316° 59' 35"   81.61   feet to a point;

Thence, following along Lot 38 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Grant 3630 to W.H. Cornwell on a curve to the left with a radius of 40.00 feet, the chord azimuth and distance being:

8.   1° 59' 35"   27.44   feet to a point;

9.   341° 56'   282.13   feet along Lots 38, 37 and 36 of this subdivision and along the remainders of Lot 77 of 'Iolani, Increment III, Phase II, Grant 3630 to W.H. Cornwell and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu to a point;

Thence, for the next three (3) courses following along the remainders of Lot 77 of 'Iolani, Increment III, Phase II and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu:

Thence, following along Lots 35, 34 and 33 of this subdivision on a curve to the left with a radius of 525.00 feet, the chord azimuth and distance being:

10.   324° 13'   319.53   feet to a point;

EXHIBIT A CONTINUED

| 11. | 306° 30' | 30.00 | feet along Lot 33 of this subdivision to a point; |

Thence, following along Lot 33 of this subdivision on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

| 12. | 261° 30' | 28.28 | feet to a point; |

| 13. | 36° 30' | 90.00 | feet along the Northwesterly side of Lako Street to the point of beginning and containing an area of 40,823 square feet, more or less. |

ROAD G
'IOLANI, INCREMENT IV, PHASE II

Land situated on the northwesterly side of Lako Street at Holualoa 1st and 2nd, North Kona, Island and County of Hawaii, State of Hawaii. Being portions of Lot 77 of 'Iolani, Increment III, Phase II; Grant 3630 to W.H. Cornwell; Grant 1592 to Kealalio; and Royal Patent 4475, Land Commission Award 7713, Apana 43 to V. Kamamalu.

Beginning at the southeasterly corner of this parcel of land, being also the southeasterly corner Lot 28 of this subdivision and being a point on the Westerly side of Lako Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "KAILUA (NORTH MERIDIAN)" being 9,824.10 feet south and 13,294.85 feet east and running by azimuth measured clockwise from true South:

| 1. | 36° 30' | 60.00 | feet along the Westerly side of Lako Street to a point; |

Thence, from a tangent azimuth of 216° 30', following along Lot 32 of this subdivision on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

EXHIBIT A CONTINUED

2.   171° 30'          28.28    feet to a point;

3.   126° 30'          30.00    feet along Lot 32 of this
                                subdivision to a point;

Thence, following along Lots 32 and 31 of this subdivision on a
                                curve to the right with a radius
                                of 410.00 feet, the chord
                                azimuth and distance being:

4.   140° 37'          200.00   feet to a point;

5.   154° 44'          103.44   feet along Lots 31 and 30 of
                                this subdivision to a point;

Thence, for the next (4) courses following along Lot 30:

6.   244° 44'          20.00    feet to a point;

7.   334° 44'          30.33    feet to a point;

Thence, following on a curve to the left with a radius of 10.00
                                feet, the chord azimuth and
                                distance being;

8.   289° 44'          14.14    feet to a point;

9.   244° 44'          10.00    feet to a point;

10.  334° 44'          20.00    feet along Lot 29 of this
                                subdivision to a point;

Thence, for the next six (6) courses following along Lot 28:

11.  64° 44'           10.00    feet to a point;

Thence, following on a curve to the left with a radius of 10.00
                                feet, the chord azimuth and
                                distance being:

12.  19° 44'           14.14    feet to a point;

13.  334° 44'          33.11    feet to a point;

EXHIBIT A CONTINUED

Thence, following on a curve to the left with a radius of 390.00 feet, the chord azimuth and distance being;

14.   320° 37'          190.24    feet to a point;

15.   306° 30'           30.00    feet to a point;

Thence, following on a curve to the left with a radius of 20.00 feet, the chord azimuth and distance being:

16.   261° 30'           28.28    feet to the point of beginning and containing an area of 7,625 square feet, more or less.

BEING THE PREMISES ACQUIRED BY LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS

GRANTOR   :   MARYL GROUP, INC., formerly known as Maryl Development, Inc., a Hawaii corporation

GRANTEE   :   PETER B. NOTTAGE, JR. and JENNIFER A. NOTTAGE, husband and wife, as Tenants by the Entirety

DATED     :   October 18, 2004
RECORDED  :   Document No. 2004-217525

Subject to any and all liens and/or encumbrances of record.



**Countrywide**
**HOME LOANS**

6400 LEGACY DR.
PTX-137
PLANO, TX 75024

August 17, 2006

Title Guaranty Escrow Svcs Inc
75-170 Hualalai Rd, Ste C210
Kailua Kona, HI 96740

Reference: Nottage-87458843

Dear Title Guaranty Escrow Svcs:

At the request of our referenced borrowers, I'm enclosing a Modification Agreement
To increase their loan amount to $1,731,257.00

Our Vice President has executed the document in advance so you can record it in
Hawaii County after execution by the borrower. Appointment contact number is: 808-
896-2453.   He will bring a personal check for the following fee payable to
Countrywide Home Loans, Inc.

<strong>LOAN INCREASE FEE: $ 1471.29</strong>

Also enclosed is a new estimated First Payment Notice and a revised Exhibit B to be
signed by August 31.

<u>All fees for your services including the additional premium to increas our mortgagee
policy coverage, mortgage tax, etc., are to be paid directly to you by the borrower.</u>

<strong><u>Return the following items by August 31.</u></strong>

1) Recorded Modification Agreement [or certified copy if recordation is delayed].
2) The personal check payable to Countrywide Home Loans for
   $1471.29.
3) A signed copy of the new Exhibit "B".
4) Your Title Policy Endorsement insuring the new loan amount.

A FEDEX return label is enclosed.

If you have questions, please call Shelly Spicer at 800-729-4073, extension 5277 and
thanks for your help.

Sincerely,

*Monica Fielder | Joyce Johnson*

Joyce Johnson
Countrywide Construction Lending

SCANNED



R-606       STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
APR 22, 2010        12:00 PM

Doc No(s) 2010-055037



/s/ NICKI ANN THOMPSON
REGISTRAR

20      2/2      Z2

After Recordation Return By: Mail ( )   Pickup ( X )

ROUTH CRABTREE OLSEN                     This document contains _2_ pages
900 FORT STREET MALL, SUITE 305
HONOLULU, HI 96813

---

TYPE OF DOCUMENT:   Notice of Mortgagee's Intention
to Foreclose Under Power Of Sale

TS #:           7518.23887
Order #:        3459218
Mortgagor(s):   Peter B. Nottage Jr and Jennifer Nottage
Mortgagee:      THE BANK OF NEW YORK MELLON, a New York corporation, AS
                TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL
                MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE
                PASS-THROUGH CERTIFICATES, SERIES 2006-21

## NOTICE OF MORTGAGEE'S INTENTION
## TO FORECLOSE UNDER POWER OF SALE

TS No: 7518.23887     TMK No: (3) 7-6-012-007-0000 & (3) 7-6-012-149-0000
Property Address: 76-863 NORTH PAKALAKALA PLACE, KAILUA KONA, HI 96740

THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-
21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, whose address is C\O
Bank of America fka Countrywide Home Loans, Inc. TX, Foreclosure Department, 7105
Corporate Dr., MS:PTX-B-35, Plano, TX 75024 ("Mortgagee"), a mortgagee pursuant to Hawaii
Revised Statutes 667-5 through 667-10, as amended, under that mortgage ("Mortgage") dated
09/15/05 and recorded on 09/20/05, in the Bureau of Conveyances in the State of Hawaii,
Regular System document number 2005-188824, gives notice that Mortgagee will hold a sale by
public auction of the real property described in the Mortgage on June 29, 2010 at 12:00 PM at
the Hale Halawai, located in the State of Hawaii, at the flag pole, Alii Drive, Kailua-Kona.

T.S. No. 7518.23887     Title No. 3459218

Terms of the sale are:  (1) No upset price; (2) Property is sold "AS IS" and "WHERE IS", without covenant or warranty, either express or implied, as to title, possession, condition of property, encumbrances or any latent or patent defects whatsoever; (3) At the close of the auction, Purchaser shall pay at least 10% of the highest successful bid price ("Bid") by cashier's or certified check and deliver it to the closing escrow and title company designated by Mortgagee; provided, however, that Mortgagee may submit a credit bid up to the amount of the secured indebtedness; (4) All bidders must be prequalified and accept in writing all sale terms prior to bidding; (5) This sale is subject to additional terms and conditions set by Mortgagee which are posted at http://www.usa-foreclosure.com/states/hi/noi and incorporated by reference; (6) If title is not conveyed to Purchaser for any reason, other than Purchaser's own failure to perform, the Mortgagee shall return the Bid to Purchaser without interest, and Purchaser shall have no further recourse against Mortgagee and its agents; (7) Time is of the essence.  Any delay in Purchaser's performance that prevents closing within 30 days after the auction shall cause Mortgagee to sustain damages which are difficult to measure. If the sale does not close solely due to Purchaser's failure to perform, the 10% down payment shall be retained by Mortgagee as liquidated damages, not as a penalty; and (8) This sale may be postponed by Mortgagee or its agent by public announcement.

**THIS FIRM IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**
Inquiries should be directed to: THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21
c/o Bank of America
Foreclosure Department
7105 Corporate Dr., MS:PTX-B-35
Plano, TX  75024
800-669-6087

Derek Wong, attorney for Mortgagee
Hifclinquiry@rcolegal.com
(808) 532-0090
Automated Sales Line 714-277-4845

State of Hawaii                          )
                                         )
City and County of Honolulu              )

    On APR 2 2 2010, before me personally appeared Derek Wong, individually, and personally known, who, being by me duly sworn or affirmed, did say that such person executed the foregoing instrument as the free act and deed of such person, and if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

    This document, consisting of 2 pages, identified as the NOTICE OF MORTGAGEE'S INTENTION TO FORECLOSE UNDER POWER OF SALE, dated APR 2 2 2010, was subscribed and sworn to before me on APR 2 2 2010 in the First Circuit of the State of Hawaii by Derek Wong, individually as aforesaid.

Notary Signature
Print Name:  BRIANNE ROSA
Notary Public, State of Hawaii

My Commission Expires:  JUN 2 8 2013



R-589     STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
APR 26, 2011          10:00 AM

Doc No(s) 2011-068022

/s/ NICKI ANN THOMPSON
REGISTRAR

20     1/1     Z9

LAND COURT SYSTEM                    REGULAR SYSTEM

Return by Mail ( ) Pickup ( X )

RCO Hawaii, LLLC
900 Fort Street Mall, Suite 800              This document consists of __17__ pages
Honolulu, HI 96813

| 76-863 NORTH PAKALAKALA PLACE | TMK No.(3) 7-6-012-007-0000 & (3) 7-6-012-149-0000 |
| KAILUA KONA, HI 96740 | Order No. 3459218 |
| (7518.23887) | |

**TYPE OF DOCUMENT:**  **Mortgagee's Affidavit of Foreclosure Under Power of Sale**

## MORTGAGEE'S AFFIDAVIT OF
## FORECLOSURE SALE UNDER POWER OF SALE

STATE OF HAWAII          )
                         ) SS.
CITY AND COUNTY OF HONOLULU )

Affiant, the undersigned, being first duly sworn on oath, deposes and says:

1.      Affiant is an attorney licensed to practice law in the State of Hawaii.

2.      Affiant has represented and acted on behalf of THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, in the matters set forth herein.

3.      Affiant certifies that the aforesaid matters occurred in compliance with and pursuant to Hawaii Revised Statutes Sections 667-5 through 667-10 and that certain mortgage dated 09/15/05, recorded in the Bureau of Conveyances of the State of Hawaii as Regular System document number 2005-188824. The mortgaged property is located at 76-863 NORTH PAKALAKALA PLACE, KAILUA KONA, HI 96740 and is identified by tax map key number (3) 7-6-012-007-0000 & (3) 7-6-012-149-0000. The legal description of the mortgaged property is attached as Exhibit "A".

Affiant;

(a)   By certified mail or personal service, caused to be forwarded a Mortgagee's Notice of Mortgagee's Intention to Foreclose Under Power of Sale in form attached hereto as Exhibit "B" and made a part hereof, to all parties who have recorded encumbrances, liens and/or other claims which have attached against the subject mortgaged property, a list of said parties being attached hereto as Exhibit "C" and made a part hereof.

(b) Not less than 21 days before the date of the public auction sale, caused a copy of Notice of Mortgagee's Intention to Foreclose Under Power of Sale to be posted on the subject mortgaged property, as evidenced by the Return of Posting attached as Exhibit "D"'and made a part hereof.

( c) Once in each of three successive weeks, with the last publication having been not less than 14 days before the date of the public auction sale, caused publication in The Honolulu Advertiser, a newspaper having a general circulation in the County of Hawaii, State of Hawaii, an advertisement setting forth a summary description of the subject mortgaged property, the mortgagee's intention to foreclosure pursuant to the power of sale under the mortgage, and the date, time and place for the public auction sale, a copy of which notice is attached hereto as Exhibit "E" and made part hereof.

(d) Upon the scheduled date, time and place, caused said sale to be postponed to 04/13/11. Each postponement was publicly announced by crying out the postponement date at the time and place of the scheduled auction. The sale was conducted and the subject mortgaged property declared sold to Moku'aina Properties LLC or its nominee, for $711,001.00, which was the highest bid at said sale.

(e) Based on the foregoing, none of the borrower(s) or mortgagor(s) is in the military service as evidenced by a true and correct copy of the Department of Manpower Data Center report(s), attached hereto as Exhibit "F".

(f) Caused a conveyance of the subject mortgaged property by way of a Mortgagee's Quitclaim conveyance to be delivered to said purchaser. The closing date of the transaction is the date of the recordation of the Mortgagee's Quitclaim conveyance.

Derek Wong
Attorney for Mortgagee
THE BANK OF NEW YORK MELLON, a New York
corporation, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWMBS, INC., CHL
MORTGAGE PASS-THROUGH TRUST 2006-21,
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-21

"Subscribed and sworn to before me
This 2𝑦 day of APR, 2011

_____ BRIANNE ROSA
Notary public, State of Hawaii
My commission expires: JUN 2 8 2013



## NOTARY CERTIFICATION
### *(Hawaii Administrative Rule §5-11-8)*

*Document Identification of Description:* **Mortgagee's Affidavit of Foreclosure Under Power of Sale**

*Date of Document:* APR 2 6 2011        *No. of Pages* 17

<u>First Circuit, City & County of Honolulu, State of Hawaii</u>
*Jurisdiction of notarial act (state and county of judicial circuit)*



~~~~Mnnne Rpa~~~~
*Signature of Notary*

  BRIANNE ROSA
*Printed Name of Notary*

  APR 2 6 2011
*Date of Notary Certificate*                    *Official Stamp or Seal*



**Exhibit "A"**

TS No. 7518.23887/167195

ALL OF THAT CERTAIN PARCEL OF LAND (BEING PORTION(S) OF THE LAND(S) DESCRIBED IN AND COVERED BY ROYAL PATENT GRANT NUMBER 1592 TO KEALALIO, ROYAL PATENT NUMBER 4475, LAND COMMISSION AWARD NUMBER 7713, APANA 43 TO V. KAMAMALU, AND LAND PATENT GRANT NUMBER 3630 TO W.H. CORNWELL) SITUATE, LYING AND BEING ON THE NORTHWESTERLY SIDE OF LAKO STREET AND ON THE SOUTHWESTERLY SIDE OF ROAD LOT G AT HOLUALOA 1ST AND 2ND, NORTH KONA, ISLAND AND COUNTY OF HAWAII, STATE OF HAWAII, BEING LOT 28 OF "IOLANI, INCREMENT IV, PHASE II", SAME BEING A PORTION OF LOT 77 OF "IOLANI, INCREMENT III, PHASE II", AND THUS BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEASTERLY CORNER OF THIS PARCEL OF LAND, BEING ALSO THE SOUTHEASTERLY CORNER OF LOT 29 OF THIS SUBDIVISION AND BEING A POINT ON THE WESTERLY SIDE OF LAKO STREET, THE COORDINATES OF SAID POINT OF BEGINNING REFERRED TO GOVERNMENT SURVEY TRIANGULATION STATION "KAILUA (NORTH MERIDIAN)" BEING 9,517.67 FEET SOUTH AND 13,329.79 FEET EAST AND RUNNING BY AZIMUTHS MEASURED CLOCKWISE FROM TRUE SOUTH:

THENCE, FOR THE NEXT FOUR (4) COURSES FOLLOWING ALONG THE WESTERLY SIDE OF LAKO STREET:

THENCE, FROM A TANGENT AZIMUTH OF 345° 24' 54" FOLLOWING ON A CURVE TO THE LEFT WITH A RADIUS OF 720.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

1. 344° 53' 12" 13.28 FEET TO A POINT;

2. 344° 21' 30" 50.00 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 270.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

3. 10° 25' 45" 237.32 FEET TO A POINT;

4. 36° 30' 15.00 FEET TO A POINT;

THENCE, FOR THE NEXT FIVE(5) COURSES FOLLOWING ALONG THE EASTERLY SIDE OF ROAD LOT G OF THIS SUBDIVISION:

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 20.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

5. 81° 30' 28.28 FEET TO A POINT;

6. 126° 30' 30.00 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 390.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

7. 140° 37' 190.24 FEET TO A POINT;

8. 154° 44' 33.11 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 10.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

9. 199° 44' 14.14 FEET TO A POINT;



10. 244° 44' 240.06 FEET ALONG THE EASTERLY SIDE OF ROAD LOT G AND ALONG LOT 29 OF THIS SUBDIVISION AND ALONG THE REMAINDERS OF LOT 77 OF 'IOLANI, INCREMENT III, PHASE II, GRANT 1592 TO KEALALIO AND ROYAL PATENT 4475, LAND COMMISSION AWARD 7713, APANA 43 TO V. KAMAMALU TO THE POINT OF BEGINNING AND CONTAINING AN AREA OF 1.111 ACRES, MORE OR LESS.

TOGETHER WITH EASEMENTS OVER, ACROSS AND ALONG ROADS B, D, E, F, G, H, I, J AND K WITHIN ALL INCREMENTS OF SAID "IOLANI SUBDIVISION", SAID ROAD B BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" ATTACHED TO INSTRUMENT, RECORDED JUNE 24, 1992 AS REGULAR SYSTEM DOCUMENT NO. 92-100275 OF OFFICIAL RECORDS, ROADS D, E AND F BEING MORE PARTICULARLY DESCRIBED IN EXHIBITS A, B AND C, RESPECTIVELY, ATTACHED TO INSTRUMENT, RECORDED AUGUST 10, 1993 AS REGULAR SYSTEM DOCUMENT NO. 93-129599 OF OFFICIAL RECORDS, SAID ROAD G, H BEING MORE PARTICULARLY DESCRIBED IN LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS RECORDED OCTOBER 26, 2004 AS REGULAR SYSTEM DOCUMENT NO. 2004-217525 OF OFFICIAL RECORDS, AND ROADS I, J AND K, ALL BEING MORE PARTICULARLY DESCRIBED IN THAT CERTAIN DEED, RECORDED JANUARY 8, 2003 AS REGULAR SYSTEM DOCUMENT NO. 2003-002769 OF OFFICIAL RECORDS; PROVIDED THAT IN THE EVENT SAID ROADS B, D, E, F, G, H, I, J AND K, OR ANY ONE OR MORE OF SAID ROADS ARE CONVEYED, TRANSFERRED AND DEDICATED TO ANY GOVERNMENTAL AUTHORITY AND ACCEPTED AS PUBLIC HIGHWAYS, THE AFORESAID EASEMENTS AS TO SUCH DEDICATED ROADS SHALL CEASE AND TERMINATE.

BEING ALL OF THE PREMISES CONVEYED BY LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS RECORDED OCTOBER 26, 2004 AS REGULAR SYSTEM DOCUMENT NO. 2004-217525 OF OFFICIAL RECORDS.
GRANTOR: MARYL GROUP, INC., FORMERLY KNOWN AS MARYL DEVELOPMENT, INC., A HAWAII CORPORATION
GRANTEE: PETER B. NOTTAGE, JR. AND JENNIFER A. NOTTAGE, HUSBAND AND WIFE, AS TENANTS BY THE ENTIRETY

EXHIBIT __A__

THE ORIGINAL OF THE DOCUMENT
RECORDED AS FOLLOWS:
STATE OF HAWAII

BUREAU OF CONVEYANCES

DATE_____ TIME _____

DOCUMENT NO.____   Doc 2010-055037

APR 22, 2010 12:00 PM

After Recordation Return By:  Mail ( )    Pickup ( X )

ROUTH CRABTREE OLSEN                    This document contains  2  pages
900 FORT STREET MALL, SUITE 305
HONOLULU, HI 96813

TYPE OF DOCUMENT:    Notice of Mortgagee's Intention
                     to Foreclose Under Power Of Sale

TS #:            7518.23887
Order #:         3459218
Mortgagor(s):    Peter B. Nottage Jr and Jennifer Nottage
Mortgagee:       THE BANK OF NEW YORK MELLON, a New York corporation, AS
                 TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL
                 MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE
                 PASS-THROUGH CERTIFICATES, SERIES 2006-21

## NOTICE OF MORTGAGEE'S INTENTION
## TO FORECLOSE UNDER POWER OF SALE

TS No: 7518.23887     TMK No: (3) 7-6-012-007-0000 & (3) 7-6-012-149-0000
Property Address: 76-883 NORTH PAKALAKALA PLACE, KAILUA KONA, HI 96740

THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-
21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, whose address is C\O
Bank of America fka Countrywide Home Loans, Inc. TX, Foreclosure Department, 7105
Corporate Dr., MS:PTX-B-35, Plano, TX 75024 ("Mortgagee"), a mortgagee pursuant to Hawaii
Revised Statutes 667-5 through 667-10, as amended, under that mortgage ("Mortgage") dated
09/15/05 and recorded on 09/20/05, in the Bureau of Conveyances in the State of Hawaii,
Regular System document number 2005-188824, gives notice that Mortgagee will hold a sale by
public auction of the real property described in the Mortgage on June 29, 2010 at 12:00 PM at
the Hale Halawai, located in the State of Hawaii, at the flag pole, Alii Drive, Kailua-Kona.



T.S. No. 7518.23887     Title No. 3459218

Terms of the sale are: (1) No upset price; (2) Property is sold "AS IS" and "WHERE IS", without
covenant or warranty, either express or implied, as to title, possession, condition of property,
encumbrances or any latent or patent defects whatsoever; (3) At the close of the auction,
Purchaser shall pay at least 10% of the highest successful bid price ("Bid") by cashier's or
certified check and deliver it to the closing escrow and title company designated by Mortgagee;
provided, however, that Mortgagee may submit a credit bid up to the amount of the secured
indebtedness; (4) All bidders must be prequalified and accept in writing all sale terms prior to
bidding; (5) This sale is subject to additional terms and conditions set by Mortgagee which are
posted at http://www.usa-foreclosure.com/states/hi/no) and incorporated by reference; (6) If title is
not conveyed to Purchaser for any reason, other than Purchaser's own failure to perform, the
Mortgagee shall return the Bid to Purchaser without interest, and Purchaser shall have no further
recourse against Mortgagee and its agents; (7) Time is of the essence. Any delay in Purchaser's
performance that prevents closing within 30 days after the auction shall cause Mortgagee to
sustain damages which are difficult to measure. If the sale does not close solely due to
Purchaser's failure to perform, the 10% down payment shall be retained by Mortgagee as
liquidated damages, not as a penalty; and (8) This sale may be postponed by Mortgagee or its
agent by public announcement.

THIS FIRM IS ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED
FOR THAT PURPOSE.
Inquiries should be directed to:  THE BANK OF NEW YORK MELLON, a New York corporation,
AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS,
INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21,
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-
21
c/o Bank of America
Foreclosure Department
7105 Corporate Dr., MS:PTX-B-35
Plano, TX 75024
800-669-6087

Derek Wong, attorney for Mortgagee
Hifclinquiry@rcolegal.com
(808) 532-0090
Automated Sales Line 714-277-4845

State of Hawaii                           )
                                          )
City and County of Honolulu               )

On  APR 2 2 2010, before me personally appeared Derek Wong, individually, and
personally known, who, being by me duly sworn or affirmed, did say that such person executed
the foregoing instrument as the free act and deed of such person, and if applicable, in the
capacity shown, having been duly authorized to execute such instrument in such capacity.

This document, consisting of 2 pages, identified as the NOTICE OF MORTGAGEE'S
INTENTION TO FORECLOSE UNDER POWER OF SALE, dated APR 2 2 2010, was subscribed and
sworn to before me on APR 2 2 2010 in the First Circuit of the State of Hawaii by Derek Wong,
individually as aforesaid.

Notary Signature
Print Name:  BRIANNE ROSA
Notary Public, State of Hawaii

My Commission Expires:  JUN 2 8 2013



EXHIBIT 3

Jennifer A. Nottage
75-5781 Kalala Pl.
Kailua-Kona, HI 96740

Peter B. Nottage Jr
75-5781 Kalala Pl.
Kailua-Kona, HI 96740

Jennifer Nottage
76-863 N Pakalakala Pl
Kailua Kona, HI 96740

Peter B. Nottage Jr
76-863 N Pakalakala Pl
Kailua Kona, HI 96740

COUNTRYWIDE HOME LOANS
PO BOX 515503
LOS ANGELES, CA 90051-6803

GMAC Mtge LLC
3451 Hammond Ae
Mail Code 507-345-786
Waterloo, IA 50702

Mortgage Electronic Registration Systems, Inc.
1901 E Voorhees Street, Suite C
Danville, IL 61834

OneWest Bank, FSB
888 E. Walnut Street
Pasadena, CA 91101

Tenant/Occupant
76-863 N Pakalakala Pl
Kailua-Kona, HI 96740

Countrywide Home Loans, Inc
P.O. Box 10219
Van Nuys, CA 91410-0219

IndyMac Bank, F.S.B.
155 North Lake Ave.
Pasadena, CA 91101



EXHIBIT C

Mortgage Electronic Registration Systems, Inc.
PO Box 2026
Flint, MI 48501-2026

State Department of Taxation
830 Punchbowl Street
Honolulu, HI 96813

EXHIBIT C

## RETURN OF POSTING

I hereby certify that a copy of the attached Notice of Mortgagee's Intention to Foreclose

Under Power of Sale was duly posted on the front door of the premises located at

76-863 NORTH PAKALAKALA PLACE, KAILUA KONA, HI, 96740

on May 3 , 2010 , at 9:30 a.m.

DATED: 5/3/10 , Kailua-Kona , Hawaii

(City signed in)

Civil Process Server
Jeannie C. Jorg

1008.12614
NOTTAGE, JR, PETER B. and JENNIFER



EXHIBIT

*IN THE MATTER OF*

NOTICE OF MORTGAGEE'S INTENTION TO
FORECLOSE UNDER POWER OF SALE



STATE OF HAWAII
City and County of Honolulu

AFFIDAVIT OF PUBLICATION

ss.

Grace Santos                                        being duly sworn
deposes and says that she is a clerk, duly authorized to
execute this affidavit of THE HONOLULU ADVERTISER, that said
newspaper is a newspaper of general circulation in the State of
Hawaii, and that the attached notice is a true notice as was
published in the aforereferenced newspaper as follows:

05/05/2010    The Honolulu Advertiser
05/12/2010    The Honolulu Advertiser
05/19/2010    The Honolulu Advertiser

and that affiant is not a party to or in any way interested in the above
entitled matter.

*Grace Santos*

Subscribed and sworn to before me this 19th day of May A.D. 2010

Jeanette Ching

Notary Public of the First Judicial Circuit
State of Hawaii
My commission expires _June 16, 2010_

This one (1) - page Affidavit of Publication
dated _May 19, 2010_, was subscribed
and sworn to before me this _19th_ day
of _May_, _2010_, in the
First Circuit of the State of Hawaii,
by _Grace Santos_

Jeanette T. Ching
Notary Public

EXHIBIT E

Request for Military Status

Department of Defense Manpower Data Center

Apr-13-2011 14:22:03



Military Status Report
Pursuant to the Service Members Civil Relief Act

| < Last Name | First/Middle | Begin Date | Active Duty Status | Active Duty End Date | Service Agency |
|---|---|---|---|---|---|
| NOTTAGE | JENNIFER | Based on the information you have furnished, the DMDC does not possess any information indicating the individual status. | | | |

Upon searching the information data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the current status of the individual as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard).

*Mary M. Snavely-Dixon*

---

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
1600 Wilson Blvd., Suite 400
Arlington, VA 22209-2593

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Service Members Civil Relief Act (50 USC App. §§ 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual is on active duty, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via the "defenselink.mil" URL http://www.defenselink.mil/faq/pis/PC09SLDR.html. If you have evidence the person is on active duty and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. §521(c).

If you obtain additional information about the person (e.g., an SSN, improved accuracy of DOB, a middle name), you can submit your request again at this Web site and we will provide a new certificate for that query.

This response reflects **active duty status** including date the individual was last on active duty, if it was within the preceding 367 days. For historical information, please contact the Service SCRA points-of-contact.

EXHIBIT

 

Request for Military Status                                    Page 2 of 2

*More information on "Active Duty Status"*
Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d)(1) for a period of more than 30 consecutive days. In the case of a member of the National Guard, includes service under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy TARs, Marine Corps ARs and Coast Guard RPAs. Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps) for a period of more than 30 consecutive days.

*Coverage Under the SCRA is Broader in Some Cases*
Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of SCRA extend beyond the last dates of active duty.

Those who would rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected.

WARNING: This certificate was provided based on a name and SSN provided by the requester. Providing an erroneous name or SSN will cause an erroneous certificate to be provided.
Report ID:IHHLP4AV5T



Request for Military Status                                                  Page 1 of 2

Department of Defense Manpower Data Center                          Apr-13-2011 14:23:17

 Military Status Report
Pursuant to the Service Members Civil Relief Act

| ◄ Last Name | First/Middle | Begin Date | Active Duty Status | Active Duty End Date | Service Agency |
|---|---|---|---|---|---|
| NOTTAGE JR. | PETER B. | Based on the information you have furnished, the DMDC does not possess any information indicating the individual status. | | | |

Upon searching the information data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the current status of the individual as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard).

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
1600 Wilson Blvd., Suite 400
Arlington, VA 22209-2593

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Service Members Civil Relief Act (50 USC App. §§ 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual is on active duty, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via the "defenselink.mil" URL http://www.defenselink.mil/faq/pis/PC09SLDR.html. If you have evidence the person is on active duty and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. §521(c).

If you obtain additional information about the person (e.g., an SSN, improved accuracy of DOB, a middle name), you can submit your request again at this Web site and we will provide a new certificate for that query.

This response reflects **active duty status** including date the individual was last on active duty, if it was within the preceding 367 days. For historical information, please contact the Service SCRA points-of-contact.

EXHIBIT **F**



Request for Military Status                                                    Page 2 of 2

*More Information on "Active Duty Status"*

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d)(1) for a period of more than 30 consecutive days. In the case of a member of the National Guard, includes service under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy TARs, Marine Corps ARs and Coast Guard RPAs. Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps) for a period of more than 30 consecutive days.

*Coverage Under the SCRA is Broader in Some Cases*

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of SCRA extend beyond the last dates of active duty.

Those who would rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected.

WARNING: This certificate was provided based on a name and SSN provided by the requester. Providing an erroneous name or SSN will cause an erroneous certificate to be provided.
Report ID:BIBE1S3AN0



R-239        STATE OF HAWAII
            BUREAU OF CONVEYANCES
                   RECORDED
            JUL 06, 2011        08:01 AM
            Doc No(s) 2011-105383

20    1/2    Z1

/s/ NICKI ANN THOMPSON
          REGISTRAR
CONVEYANCE TAX: $1777.50

| LAND COURT SYSTEM | REGULAR SYSTEM |
| Return by Mail ( X ) Pickup ( ) | |

Lanikai Hui, LLC
75-6106 Paulchia Street
Kailua-Kona, HI 96740

TG: _2011 17011 - A_

TGE: _T11014055_   R|5

Jeremy Trueblood  

This document consists of ( 4 ) pages

76-863 NORTH PAKALAKALA PLACE
KAILUA KONA, HI  96740
(7518.23887)

TMK NO(3) 7-6-012-007-0000 & (3) 7-6-
             012-149-0000
Title Order No.3459218

## LIMITED WARRANTY DEED

    THIS INSTRUMENT made as of this 13ᵗʰ day of April, 2011, by and between THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, as foreclosing mortgagee with full powers to sell, convey, transfer, mortgage, lease, or otherwise deal with real property, hereinafter called the "Grantor", and Lanikai Hui, LLC, a Hawaii Limited Liability Company, as Tenant in Severalty, who is the purchaser or its nominee, whose address is 75-6106 Paulchia Street Kailua-Kona HI 96740, hereinafter called the "Grantee";

### WITNESSETH:

    That for TEN DOLLARS ($10.00), and other valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, the Grantor does hereby grant, bargain, sell and convey unto the Grantee, in fee simple, all that certain real property described in EXHIBIT A attached hereto and made a part hereof, and together with the personal property, if any, described in said EXHIBIT A;

And the reversions, remainders, rents, issues and profits thereof and all of the estate, right, title and interest of the Grantor, both at law and in equity, therein and thereto;

The parties agree that the property is conveyed by the Grantor to the Grantee "AS IS", without Warranty or representation, express or implied, as to condition, or fitness for any purpose whatsoever, and Grantee accepts the same "AS IS";

TO HAVE AND TO HOLD  the same, together with all buildings, improvements, rights easements, privileges and appurtenances thereon and thereto belonging or appertaining or held and enjoyed therewith, unto the Grantee according to the tenancy herein set forth, forever.

AND, in consideration of the premised, the Grantor does hereby covenant with the Grantee that the Grantor is lawfully seized of the real property herein described in fee simple; that said real property is free and clear of and from all liens and encumbrances made or suffered by said Grantor, except for the lien of real property taxes not yet by law required to be paid, and except as set forth herein; that the Grantor has good right to sell and convey said real property, as aforesaid; and, that the Grantor will WARRANT AND DEFEND the same unto the Grantee against the lawful claims and demands of all persons claiming by, through or under said Grantor, except as aforesaid.

The conveyance herein set forth and the warranties of the Grantor concerning the same are expressly declared to be in favor of the Grantee, and the Grantee's heirs, devisees, personal representatives, successors and assigns, according to the context thereof.

The terms "Grantor" and "Grantee", as and when used herein, or any pronouns used in place thereof, shall mean and include the masculine, feminine or neuter, the singular or plural number, and each of their respective heirs, devisees, personal representatives, successors and assigns, according to the context thereof. All covenants and obligations undertaken by two or more persons shall be deemed to be joint and several unless a contrary intention is clearly expressed elsewhere herein.

The parties hereto agree that this instrument may be executed in counterparts, each of which shall be deemed an original, and said counterparts shall together constitute one and the same agreement, binding all of the parties hereto, notwithstanding all of the parties are not signatory to the original or the same counterparts. For all purposes, including, without limitation, recordation, filing and delivery of this instrument duplicate unexecuted and unacknowledged pages of the counterparts may be discarded and the remaining pages assembled as one document.

IN WITNESS WHEREOF, the parties have executed this instrument as of the date set forth above.

Grantor: THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21,

By: _____

Name:        Stephanie Sanchez

Its:      Assistant Vice President

State of      California

County of      Ventura                                    and ___

On   5/20/11    before me,      Grant Cameron       Notary Public, personally appeared     Stephanie Sanchez    , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_____

GRANT CAMERON
COMM. # 1849219
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES MAY 15, 2013

**Exhibit "A"**

**TS No. 7518.23887/167195**

ALL OF THAT CERTAIN PARCEL OF LAND (BEING PORTION(S) OF THE LAND(S) DESCRIBED IN AND
COVERED BY ROYAL PATENT GRANT NUMBER 1592 TO KEALALIO, ROYAL PATENT NUMBER 4475, LAND
COMMISSION AWARD NUMBER 7713, APANA 43 TO V. KAMAMALU, AND LAND PATENT GRANT NUMBER
3630 TO W.H. CORNWELL) SITUATE, LYING AND BEING ON THE NORTHWESTERLY SIDE OF LAKO
STREET AND ON THE SOUTHWESTERLY SIDE OF ROAD LOT G AT HOLUALOA 1ST AND 2ND, NORTH
KONA, ISLAND AND COUNTY OF HAWAII, STATE OF HAWAII, BEING LOT 28 OF "IOLANI, INCREMENT
IV, PHASE II", SAME BEING A PORTION OF LOT 77 OF "IOLANI, INCREMENT III, PHASE II", AND THUS
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEASTERLY CORNER OF THIS PARCEL OF LAND, BEING ALSO THE
SOUTHEASTERLY CORNER OF LOT 29 OF THIS SUBDIVISION AND BEING A POINT ON THE WESTERLY
SIDE OF LAKO STREET, THE COORDINATES OF SAID POINT OF BEGINNING REFERRED TO
GOVERNMENT SURVEY TRIANGULATION STATION "KAILUA (NORTH MERIDIAN)" BEING 9,517.67 FEET
SOUTH AND 13,329.79 FEET EAST AND RUNNING BY AZIMUTHS MEASURED CLOCKWISE FROM TRUE
SOUTH:

THENCE, FOR THE NEXT FOUR (4) COURSES FOLLOWING ALONG THE WESTERLY SIDE OF LAKO
STREET:

THENCE, FROM A TANGENT AZIMUTH OF 345° 24' 54" FOLLOWING ON A CURVE TO THE LEFT WITH A
RADIUS OF 720.00 FEET, THE CHORD AZIMUTH AND DISTANCE BEING:

1. 344° 53' 12" 13.28 FEET TO A POINT;

2. 344° 21' 30" 50.00 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 270.00 FEET, THE CHORD
AZIMUTH AND DISTANCE BEING:

3. 10° 25' 45" 237.32 FEET TO A POINT;

4. 36° 30' 15.00 FEET TO A POINT;

THENCE, FOR THE NEXT FIVE(5) COURSES FOLLOWING ALONG THE EASTERLY SIDE OF ROAD LOT G
OF THIS SUBDIVISION:

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 20.00 FEET, THE CHORD
AZIMUTH AND DISTANCE BEING:

5. 81° 30' 28.28 FEET TO A POINT;

6. 126° 30' 30.00 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 390.00 FEET, THE CHORD
AZIMUTH AND DISTANCE BEING:

7. 140° 37' 190.24 FEET TO A POINT;

8. 154° 44' 33.11 FEET TO A POINT;

THENCE, FOLLOWING ON A CURVE TO THE RIGHT WITH A RADIUS OF 10.00 FEET, THE CHORD
AZIMUTH AND DISTANCE BEING:

9. 199° 44' 14.14 FEET TO A POINT;

10. 244° 44' 240.06 FEET ALONG THE EASTERLY SIDE OF ROAD LOT G AND ALONG LOT 29 OF THIS SUBDIVISION AND ALONG THE REMAINDERS OF LOT 77 OF 'IOLANI, INCREMENT III, PHASE II, GRANT 1592 TO KEALALIO AND ROYAL PATENT 4475, LAND COMMISSION AWARD 7713, APANA 43 TO V. KAMAMALU TO THE POINT OF BEGINNING AND CONTAINING AN AREA OF 1.111 ACRES, MORE OR LESS.

TOGETHER WITH EASEMENTS OVER, ACROSS AND ALONG ROADS B, D, E, F, G, H, I, J AND K WITHIN ALL INCREMENTS OF SAID "IOLANI SUBDIVISION", SAID ROAD B BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" ATTACHED TO INSTRUMENT, RECORDED JUNE 24, 1992 AS REGULAR SYSTEM DOCUMENT NO. 92-100275 OF OFFICIAL RECORDS, ROADS D, E AND F BEING MORE PARTICULARLY DESCRIBED IN EXHIBITS A, B AND C, RESPECTIVELY, ATTACHED TO INSTRUMENT, RECORDED AUGUST 10, 1993 AS REGULAR SYSTEM DOCUMENT NO. 93-129599 OF OFFICIAL RECORDS, SAID ROAD G, H BEING MORE PARTICULARLY DESCRIBED IN LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS RECORDED OCTOBER 26, 2004 AS REGULAR SYSTEM DOCUMENT NO. 2004-217525 OF OFFICIAL RECORDS, AND ROADS I, J AND K, ALL BEING MORE PARTICULARLY DESCRIBED IN THAT CERTAIN DEED, RECORDED JANUARY 8, 2003 AS REGULAR SYSTEM DOCUMENT NO. 2003-002769 OF OFFICIAL RECORDS; PROVIDED THAT IN THE EVENT SAID ROADS B, D, E, F, G, H, I, J AND K, OR ANY ONE OR MORE OF SAID ROADS ARE CONVEYED, TRANSFERRED AND DEDICATED TO ANY GOVERNMENTAL AUTHORITY AND ACCEPTED AS PUBLIC HIGHWAYS, THE AFORESAID EASEMENTS AS TO SUCH DEDICATED ROADS SHALL CEASE AND TERMINATE.

BEING ALL OF THE PREMISES CONVEYED BY LIMITED WARRANTY DEED WITH COVENANTS AND RESERVATIONS RECORDED OCTOBER 26, 2004 AS REGULAR SYSTEM DOCUMENT NO. 2004-217525 OF OFFICIAL RECORDS.
GRANTOR: MARYL GROUP, INC., FORMERLY KNOWN AS MARYL DEVELOPMENT, INC., A HAWAII CORPORATION
GRANTEE: PETER B. NOTTAGE, JR. AND JENNIFER A. NOTTAGE, HUSBAND AND WIFE, AS TENANTS BY THE ENTIRETY

R-605           STATE OF HAWAII
          BUREAU OF CONVEYANCES
                RECORDED
          APR 22, 2010          12:00 PM

          Doc No(s) 2010-055036

                              /s/ NICKI ANN THOMPSON
   20     1/2    Z2                    REGISTRAR

LAND COURT SYSTEM               REGULAR SYSTEM
Return by Mail () Pickup ( X )

Routh Crabtree Olsen
900 Fort Street Mall, Suite 305
Honolulu, HI 96813

                        This document consists of _2_ pages
76-863 NORTH PAKALAKALA PLACE          MIN No.1000157-0005061572-9
KAILUA KONA, HI 96740                  TMK (3) 7-6-012-007-0000
(7518.23887)                           & (3) 7-6-012-149-0000
                                       Order No. 3459218

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, Mortgage electronic Registration Systems, Inc. solely as nominee for Countrywide Home Loans, Inc., a New York corporation, does hereby transfer without recourse to THE BANK OF NEW YORK MELLON, a New York corporation, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21, whose address is, C\O Bank of America fka Countrywide Home Loans, Inc. TX, Foreclosure Department, 7105 Corporate Dr., MS:PTX-B-35, Plano, TX 75024, all of its right; title and interest in and to that certain mortgage recorded on 09/20/05 in the Bureau of Conveyances, State of Hawaii, Regular System document number **2005-188824**

Signed on the _26_ day of _March_ 2010.

**Mortgage electronic Registration Systems, Inc. solely as nominee for Countrywide Home Loans, Inc., a New York corporation**

By: _R. Rice_

Name: _Rhoena Rice - Vice President_

Title: _____

State of _Texas_ )
County of _Tarrant_ ) SS:

On _____, before me personally appeared _Rhoena Rice - Vice President_, individually, and personally known, who, being by me duly sworn or affirmed, did say that such person executed the foregoing instrument as the free act and deed of such person, and if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

_26_ This document, consisting of _3_ pages, identified as the Assignment of Mortgage, dated _____, was subscribed and sworn to before me on _March_ in _Ft. Worth , TEXAS._ by _Rhoena Rice_, individually as aforesaid.

_Stephanie Rivera_
Notary Signature
Print Name: _Stephanie Rivera_
Notary Public, State of: _TEXAS_
My Commission Expires: _2-12-14_

STEPHANIE RIVERA
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-12-14